THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK v. THE SECOND AVENUE RAILROAD COMPANY.

*It seems*, the rights of municipal corporations to property in lands, and to create and establish ferries, railroad franchises, &c., are distinct and separate from their duties as legislatures, having authority to pass ordinances, &c.

The latter are powers held in trust to be used and exercised for the benefit and welfare of the whole community.

The former rights have respect to property in the ordinary sense, to be acquired and conveyed in the same manner as natural persons acquire and convey property, and subject to the operation of such ordinances and by-laws as may be lawfully passed for the government and control of the city.

Municipal corporations have no power as a party to make contracts which shall control or embarrass their legislative powers and duties.

Municipal corporations can legislate only in respect to regulations of police and internal government, and not for the mere imposition of a duty or sum of money for revenue purposes.

An ordinance imposing a license duty upon city cars, for revenue purposes only, is not an ordinance for police and internal government.

The imposition of an annual tax by such corporation upon a railroad company, in derogation of its rights, for purposes of revenue merely, is unlawful and void.

THIS action was brought to recover the penalty of fifty dollars, imposed by an ordinance passed by the plaintiffs December 31, 1858, upon the proprietor of every passenger railroad car running in the city of New York below 125th street, who should not procure a license from the mayor for each car, and pay annually therefor the fee of fifty dollars.

All the facts alleged in the complaint are admitted by the answer; but the defendants set up as a defense an agreement made between the plaintiffs and the defendants' assignors, dated December 15, 1852, whereby permission was granted to such assignors to construct and operate a railroad in Second avenue, and which, they contend, estops the plaintiffs from requiring any license.

To this answer there was a demurrer, which was overruled at Special Term, and the judgment affirmed at General Term, INGRAHAM, J., dissenting.

From that judgment the plaintiffs appeal to this court.

The only question presented is that of the validity of the ordinance of December 31, 1858.

*J. L. Jernegan & T. C. Fields*, for the appellants.

I. The power to pass this ordinance is conferred upon the city government by the charter of Governor Dongan, and confirmed by the Montgomery charter.

1. By virtue of the general power " to make laws, orders, ordinances and constitutions in writing, * * for the good rule, oversight, correction and government of the said city, and liberties," and " of all officers, ministers, artificers, citizens, inhabitants and residents of the said city," " and for declaring how and after what manner and order the mayor, &c., * * * and all artificers, inhabitants and residents of the same city, and their factors, servants and apprentices, in their offices, functions and business within the said city, &c., shall use, carry and bear themselves; and for the further public good, common profit, trade and better government and rule of the said city, &c." (See section 14 of Montgomery charter.)

(*a.*) This power, *ex vi terminorum*, extends to every inhabitant of the city, to every class of business carried on within the city, and authorizes every species of ordinance in relation to both, which " the good rule and oversight " of the city, " the public good " and the interests of trade may require.

(*b.*) This includes railroad corporations and the business of such corporations.

(*c.*) The licensing of public vehicles is a power clearly conferred by this section. It is required in all well regulated cities. Its object is to enable the city government to retain such a control over these vehicles, as to preserve peace and good order, hinder the employment of disorderly drivers or conductors, prevent imposition upon passengers and protect their limbs and lives against the dangers to which such vehicles are exposed. (See Wilcock on Corp., 55; Grant on Corp., 76.)

(*d.*) The necessity of such control over railroad cars is greater than in relation to private vehicles: 1. Because such

carriages are more dangerous than ordinary ones to foot passengers, and when running in great numbers, are a greater obstruction to the free passage of the streets; and, 2. Because each road is monopolized by one company, and the consequent power and opportunity to impose upon and injure the public is greatly increased.

(e.) The authors of the Montgomery charter did not have any prophetic vision of railroads, but they are within the reason if not even within the letter of the law; and, as said by McLEAN, J., in License Cases, 5 How. U. S., 504, 589: "In all matters of police a wide discretion is necessary. It is not susceptible of exact limitation. It must be exercised according to the changing exigencies of society."

2. The right to pass this ordinance is conferred by virtue of the power "to establish, appoint, order, and direct the establishing, making, laying out, ordering, amending and repairing of all streets, lanes, and alleys, highways," &c.

(a.) The power of ordering the streets includes the power to order the mode in which they shall be used; and this necessarily implies the power to order the mode in which vehicles for the transportation of passengers shall be employed and regulated.

(b.) The power to license such vehicles is one of those usual and customary modes in which that power of regulation may be and is exercised.

(c.) It is, therefore, a power incident to and included in the principal power.

II. This ordinance is the exercise of the ordinary police power of the common council, and not the assumption of a power of taxation.

1. Licenses of public vehicles are intended as part of a scheme of good government, as a means of controlling the conduct of their proprietors, of preserving order and preventing accidents in the streets, and protecting passengers from imposition. So it was held in the case of *People ex rel Houston* v. *Mayor of N. Y.*, 7 How. Pr., 81, and that they are not to be considered a fiscal regulation or the exercise of a taxing power.

2. Licenses are often resorted to as a means of regulating other branches of business in such a manner as the public welfare has seemed to the legislator to require; and in all such cases they are held to be measures of police and not fiscal regulations.

(a.) In the celebrated License Case, 5 How. U. S., 504, the court held that licenses to sell spirits were a matter of police, and not an impost or commercial regulation. (See opinions of Taney, Ch. J., 583; of M'Lean, J., 589; Woodbury, J., 623.)

(b.) In *City of New York* v. *Miln* (11 Pet., 130), the Supreme Court of the United States held that the imposition of a penalty on the master of a foreign vessel for a failure to report an account of his passengers, was a measure of national police only, and not a fiscal or commercial regulation.

III. The question whether this ordinance is a regulation of police, or one of revenue, is not a question of the motive of the common council, but a question of power. In other words, it is a question whether or not the common council, in enacting this ordinance, passed the appropriate line which limits laws for the regulation of matters of police. If they did not, the ordinance is valid.

1. Where a discretion is vested in a municipal body exercising legislative functions, courts are bound to assume that good reasons existed for the adoption of their ordinances. (*Oneida Com. Pleas* v. *People*, 19 Wend., 79, 99.) Nor can the legislative acts of such body be reviewed, if within the scope of their legislative authority, or their motives in any case be inquired into. (*Milhau* v. *Sharp*, 15 Barb., 193; *New York & Harlem Railroad Co.* v. *Mayor, &c.*, 1 Hilt., 562.)

2. In the License Case, *supra*, the question was, whether the acts of the legislature were enacted by virtue of the police power of the State, which it possesses to guard the health and lives of its citizens, or to regulate foreign commerce; and the court held that the motives of the legislature were of no consequence and could not influence the decision,

but that it was a question of power, a question whether such acts of legislation were prohibited by the Federal Constitution. (See p. 583.)

3. In the case of *Cooley* v. *Board of Wardens, &c.* (2 How. U. S., 299), the question was, whether the imposition by a State of certain pilotage fees upon vessels which refused to take a pilot, was the exaction of an impost, or duty, or merely a police regulation. And the court held that although the proceeds of these fees were appropriated to the use of a charity, yet it was a question, not whether a duty might be levied under a pretense of pilot dues, but merely whether the act passed the appropriate line which limits laws for the regulation of pilotage. And they held that it did not, and so could not be deemed a fiscal regulation.

4. It is true the sum demanded for license may be so great as to destroy the profits of the corporation. But such is not the case here. Nor does the fact that a power may be abused prove that such a power does not exist. The same argument would disprove the existence of a power to license hackney coaches, &c. When the power is abused, it is for the legislature alone to apply the remedy.

IV. The power to license public vehicles being a legislative power residing in the common council, it was not competent for them to surrender this power, or any portion of it, or to bind their legislative capacities by any private arrangement or contract, so as to disable them from enacting any ordinance that might be deemed essential for the public good. (*Brick Presbyterian Church* v. *City of New York*, 5 Cow., 538; *Stuyvesant* v. *Mayor of New York*, 7 id., 585; *Mayor of New York* v. *Bretton*, 12 Abb., 369, note, per Nelson, Ch. J.)

V. The agreement of 1852 was not such a license to the defendants as rendered it incompetent for the common council to require the license mentioned in this ordinance.

1. The common council had no power to grant defendants permission to construct and operate a street railroad. (*Davis* v. *Mayor, &c.*, 4 Kern., 506.)

2. Consequently, such a permission vested no right in the defendants, either by way of license or easement.

VI. Such a grant by the legislature, as above indicated, leaves unimpaired the power of the plaintiffs to regulate the streets and pass ordinances for the public security and order. (*New York & Harlem Railroad Co.* v. *Mayor*, &c., 1 Hilt., 562; *New York & New Haven Railroad Co.* v. *Same*, decided by Nelson, J., in United States Circuit Court; *Ibid*, note.)

VII. Even if the defendants could establish that the agreement of 1852 was a license, it would not avail then.

1. If a license only, it was a mere authority personal to the grantors, not assignable, therefore, to the defendants, and, even if assignable to them, revocable by the plaintiffs at will. (*Ex parte Coburn*, 1 Cow., 568; *Jackson ex dem. Hall* v. *Babcock*, 4 Johns., 418; *Miller* v. *Auburn & Syracuse Railroad Co.*, 6 Hill, 61; *Munford* v. *Whitney*, 15 Wend., 380; 3 Kent's Com., 4th ed., 451.)

*Waldo Hutchins & John Slosson*, for the respondents.

I. The agreement set out in the answer is the grant of a franchise, and constitutes a contract between the corporation and the defendants, upon which the former cannot engraft any provision or condition, unless by virtue of a right to do so expressly or impliedly reserved in the agreement itself, or by virtue of the general power possessed by the corporation in respect to the regulation of the public streets. (*Davis* v. *The Mayor*, &c., *of New York*, 14 N. Y., 823; *The State of New York* v. *The Mayor*, &c., 3 Duer, 116; *Brooklyn City Railroad Co.* v. *Central Railroad Co.*, 32 Barb., 364.)

1. No such right is reserved in the agreement itself. The only portion of it upon which· such a right can with any semblance of plausibility be predicated is the resolution of the corporation, recited in the agreement, and made part of the contract, by which the defendants are required, before the permission is to take effect, " to enter into a good and sufficient agreement with the mayor, &c., binding themselves to abide by and perform the stipulations (in the ordinance giving the license) contained; and, *also, all such other regulations or ordinances as may be passed by the common council relating to the said railroad.*"

This does not authorize the imposition of a license fee, under penalty of a pecuniary forfeiture, for the following reasons :

(*a.*) It is not necessary, nor would it be proper, that the resolution above quoted should be taken in an absolute sense, as this might lead to an absurdity.

(*b.*) The language of it implies a qualified and subordinate sense, and what this 'is, is to be gathered from the whole instrument or agreement, the common rule of interpretation applying that an agreement is to be so read that all its provisions may, if possible, harmonize.

(*c.*) Following this rule, the meaning of the clause in italics, in the resolution quoted, is apparent.

The agreement had already made special provisions for the mode of laying the rails and keeping the streets in and about the same in repair, restricting the propelling power to horses, regulating the number of times the cars should be run during the day, and between what hours, and providing that they should be run as much oftener as public convenience might require " under such *directions* as the common council may *from time to time prescribe*," also prescribing limits to the rate of fare, and *reserving to the corporation the right* to regulate the fare for the entire length of the road when completed to Harlem river.   Then follows a separate resolution that the parties should in all respects comply with the directions of the street commissioners and of the common council in the building of the road and the running of the cars, " and in any other matter connected with the *regulation* of said road."

And then follows the resolution quoted above, providing for the agreement by which the defendants shall bind themselves " to perform the stipulations and provisions herein contained, and all *such other regulations or ordinances* as may be passed by the common council relating to the said railroad."   It is perfectly manifest that the words " such other regulations or ordinances " were intended and must have been so understood by the parties, to apply to mere ordinances *of regulation,* in respect to the road not already provided for, and *such as,* or of the like general character of those already expressly stipulated.

Such is the natural and obvious meaning of the clause under the rule of interpretation referred to.

This is further obvious from the resolution immediately preceding the one under discussion, and also above quoted, by which the defendants are obligated to comply with the directions of the common council in building the road, running the cars, " and in any *other matter* connected with the *regulation* of said railroad." In fact the resolution under discussion is not broader than the one just quoted (except in providing for the express agreement), unless the words " or ordinances " " relating to the said railroad " shall be held to extend its meaning. These words follow the words " all such other regulations," and are connected with the disjunctive " or," thus assimilating " ordinances " to " regulations," and evidently giving to each a cognate meaning, and the words "relating to the said railroad" must be read in the same light, " regulations relating to such railroad." The whole provision is *in pari materia*, relating to the *same subject;* and that is, the regulation and management of the road.

(*d.*) To give to these words an absolute meaning, would be to empower the corporation to impose conditions, fines, fees, or penalties without limit, to the utter destruction of the franchise, which is absurd, and can be sustained on no rule of interpretation known to the law.

(*e.*) The imposition of a license fee, with or without a penalty, has no respect to the *regulation of the road.* It is a pure act of arbitrary power, for purposes of revenue, and in the nature of a tax, and if it exists, is, in its own nature, unlimited and uncontrollable, and may be carried to any extent. (*People* v. *The Mayor*, 4 Comst., 419.)

To suppose the parties ever contemplated such a reserved right is simply absurd. If the parties had intended a license fee at all, it would have been provided for in the agreement, under proper limitations.

Thus, in the agreement with the Third Avenue Railroad, there is an express provision that the company shall pay "the annual license for each car *now allowed by law.*" (See Corporation Ordinances, Revised, 1859, p. 561.)

And in the case of all the other railroads which have been licensed by the corporation, or all licensed about this time, special provisions are incorporated in the agreements with the companies in respect to license fees. (See the agreements with the Sixth and Eighth Avenues, in same volume, both which were entered into prior to that of the Second Avenue.)

2. No such right as that now claimed on behalf of the corporation exists under their general powers in respect to the public streets, such powers, as defined by the charters, colonial and legislative, being wholly those of regulation and police, and in no sense analogous to that attempted to be exercised by the resolution imposing a license fee with a penalty, now under discussion. (*The People* v. *Kerr*, 25 How. Pr., 263, 264, 265 ; 1 Caines Term R., 544.)

II. There is nothing in this view of the case, in conflict with the rule, that a municipal corporation cannot by contract divest itself of its legislative powers.   The rule may be conceded, but its application in the present case denied. When it is necessary to prevent a public *nuisance*, for the general public health or good, the corporation may, undoubtedly, by an ordinance, accomplish this object, although a party to a contract by which they have given the right to the offending party.   *Brick Church* v. *The Mayor* (5 Cow., 538), and *Coates* v. *Mayor* (7 id., 538), were decided on this principle of *nuisance*, and the court held that the ordinances complained of did not, on that account, impair the obligation of a contract.

In so far as the corporation can contract, it is treated by all the cases as an individual, and it is a mere abuse to say that under the pretext of exercising a legislative power, it may, by an ordinance, impose terms and conditions on the enjoyment of a franchise which it has granted by contract, without the reservation of a right so to do.   Should the public welfare, or public health, or public convenience even, require that the rails of a city railroad should be taken up altogether, it might, perhaps, be claimed with a semblance of truth that an ordinance to that effect was a lawful exercise of legislative power, and as not impairing the obligation

of its contract, but this certainly is a different case from that of an ordinance requiring the payment of an annual fee, of $50, or $1,000, or $10,000 (for the right admitted, the amount is unlimited), for the *enjoyment* or *use* of the franchise already granted without restriction.

It may be here remarked that in the two cases above cited, there was a previous statute of the State expressly authorizing the city authorities to *prevent*, if necessary, the interment of the dead within the city, which makes those cases still more dissimilar to the present.

III. Penalties may perhaps be properly imposed for the violation of the ordinary ordinances of street regulations and police, but the resolution now under discussion imposes an obligation to contribute to the city revenue, an annual sum, under the name of a license fee, and this, after the absolute grant of the franchise to run the defendant's cars, without the reservation of such right.

Brown, J.  The counsel for the plaintiff, in his seventh point, contends that the common council of the city of New York had no power to grant to the defendants the railroad franchise referred to in the pleadings in this action, and, consequently, no right to operate the road either by way of license or easement vested in the defendant.  It seems to me that this ground is scarcely tenable.  Certainly not as a reason for sustaining the plaintiffs' action.  Its object is to recover from the company a penalty for a breach of the corporation ordinance in omitting to pay for and accept what is termed a license.  No usurpation or wrongful exercise of the franchise is alleged, but the action assumes that the company's uses of the street for the transit of passengers is rightful in all respects, except in the neglect or refusal to pay for and accept the license.  Neither the grant to Pearsall and his associates nor the assignment and transfer of their interest to the defendant are open to controversy in this litigation.  After the grant of the franchise, the passage of the ordinance, and the prosecution of the action to recover the penalty for the omission to take out the license, the com-

mon council are not now in a position to deny the legal existence of the franchise.

To enable the city to maintain this action it is not enough, I apprehend, to show that its powers and duties as a legislature, exercising a part of the sovereign authority, are not impaired or affected by its acts as a person making conveyances of property or grants of incorporeal interests, having the nature and qualities of property to others.  The rights of municipal corporations to property in lands and its usual incidents, and to create and establish ferries and railroad franchises, are quite distinct and separate from their duties as legislatures, having authority to pass ordinances for the control and government of persons and interests within the city limits.  The latter are powers held in trust, as all legislative powers are, to be used and exercised for the benefit and welfare of the whole community, while the former are property, in the ordinary sense, to be acquired and conveyed in the same manner as natural persons acquire and transfer property, and subject to the operation of such ordinances and by-laws as may be lawfully passed for the government and control of the city.  In this respect there can be no distinction between lands the title to which is derived mediately or immediately from the city, with covenants of title and warranty, and lands the title of which is acquired from private individuals.  The two cases of the *Presbyterian Church* v. *The City of New York* (5 Cowen, 538), and *Coates* v. *The Mayor, &c.* (7 Cowen, 585), assert this doctrine, holding that lands in the one case granted by the crown and in the other by the city itself for cemetery purposes, and devoted to such uses from time immemorial, were, nevertheless, subject to the ordinances of the corporation prohibiting *intra mural* interments.  In the first named case, Ch. J. SAVAGE says: "In ascertaining their rights and liabilities as a corporation, or as an individual, we must not consider their legislative character.  They had no power as a party to make a contract which should control or embarrass their legislative powers and duties.  Their enactments in their legislative capacity are to have the same effect upon

their individual acts as upon those of any other person or the public at large, and no other effect.

The plaintiffs must show, however, that the subject of the ordinance which they are seeking to enforce, is one over which they have authority to legislate, and that it is a regulation of police and internal government, and not the mere imposition of a duty or sum of money for the purposes of revenue. The agreement between the plaintiffs, and Pearsall and his associates, of the 15th December, 1852, has all the properties of a contract. The latter were to have and enjoy the use of the streets and avenues mentioned in the first resolution of the common council for the purpose of constructing and operating thereon a railroad for the convenience of public travel. The rails were to be put down by Pearsall and his associates in the manner prescribed, and they were also to pave the streets in and about the rails in a permanent manner, and keep the same in repair to the satisfaction of the street commissioner. They were also to run a car on the road for the convenience of public travel, each and every day, both ways, as often as every fifteen minutes from 5 to 6 o'clock, A. M.; and every four minutes from 6 o'clock, A. M. to 8 o'clock, P. M.; every fifteen minutes from 8 o'clock, P. M. to 12 o'clock, M.; and every thirty minutes from 12 M. to 5 o'clock, A. M., and as much oftener as the public convenience may require, under such directions as the common council may from time to time prescribe. All this has to be performed by the grantees as the consideration for the franchise granted them. Assuming that the common council had power to make the grant, then its acceptance by Pearsall and his associates, signified by the execution of the agreement with the conditions annexed thereto, and the duties and obligations resulting therefrom, invested the latter with the right of property in the franchise which the common council could not take away or impair by any subsequent act of its own. The resolutions which were incorporated into the contract were not an act of legislation which the common council could modify or repeal without the consent of the other party to the instrument. (*Dartmouth College* v. *Woodward*, 11 Wheat.,

511.) The grantees, it is true, were by the resolutions to comply with the regulations of the street commissioners and the common council in building the road and running the cars thereon, and. also such other regulations or ordinances as may be passed by the common council relating to the road. This right of regulation and control the plaintiff specially reserved in the instrument containing the grant, in addition to their general powers to make ordinances and regulations of police for the government of the city. This brings me to consider the nature and character of the ordinance for the breach of which this action is brought.

Section 106 declares that "each and every passenger railroad car running in the city of New York below 125th street, shall pay into the city treasury the sum of fifty dollars annually for a license, a certificate of such payment to be procured from the mayor, except the small one-horse passenger cars, which shall each pay the sum of twenty-five dollars annually for such license as aforesaid." Section 2 declares that "each certificate of payment of license shall be affixed to some conspicuous place in the car, that it may be inspected by the proper officer." And section 3 prescribes the penalty for running a car without the proper certificate. That is all. There is nothing for the railroad corporations to do but to pay to the mayor the sum of fifty dollars annually for each car, and receive in return a license or certificate that the money has been paid. The ordinance imposes no duties to be observed by the company or its servants, but the single act of paying the money. It prescribes all regulations in regard to the size, dimensions, comfort and cleanliness of the cars, the speed at which the same shall be run, the manner of receiving and discharging passengers, their numbers and names, and the stations at which they shall stop. Regulations. of police are regulations of internal or domestic government, forbidding some things and enjoining the performance of others for the security and protection, and to promote the happiness of the governed. The only act enjoined by the ordinance in question is the payment of the fifty dollars, and the only act which it forbids and prohibits is the running of the cars

without the payment of the money. If the legislature should by law require every head of a family throughout the State to pay to the collector the sum of twenty dollars, and take his receipt therefor, it would be a fiscal measure, an expedient to replenish the treasury, not a regulation of police prescribing a rule of action and conduct. So with this ordinance, call what it requires by the name of license or certificate of payment, or anything else, its primary, and indeed, only purpose is to take from the company, under coercion of the penalty which it imposes, the sum of fifty dollars annually for each car run upon the road for the benefit of the city. The certificate which the company is to receive upon payment being made, is called a license in the ordinance. A license to do what the ordinance does not say — and indeed it could not, with truth, say — a license or permission to employ the car in the transportation of passengers upon the road, for the absolute right to do that which had been not only acquired, but positively enjoined upon the company by the stipulations of the grant of the 15th of December, 1852. It is in vain, therefore, to speak of it or to treat it as a license, or a regulation of police. It is the imposition of an annual tax upon the company in derogation of its rights of property, and on that account is unlawful and void.

The judgment of the Supreme Court should be affirmed, with costs.

Judgment affirmed.