STATE, THE NORTH HUDSON COUNTY RAILWAY COMPANY, PROSECUTORS, v. THE MAYOR AND COMMON COUNCIL OF THE CITY OF HOBOKEN.

1. A municipal corporation, under the ordinary powers of local government, may pass ordinances requiring a horse railroad company, incorporated by the legislature, and having its rails down and in use through the streets, under legislative sanction, to make its tracks conform to grade; to keep in repair the space between the rails; to remove snow, and the like. Such regulations do not appreciably interfere with the franchises of the company, and the legislature is presumed to have intended, when it authorized the use of the public streets for such purposes, that its grantee should hold its privileges subject to such regulations as are reasonably necessary for the common use of the streets for a street railway, and for ordinary travel.

2. But a municipal corporation has no power to require a horse railway company, having its rails down and in use, under the act incorporating it, to take out a license and pay a license fee as a means of taxation, unless power is given to the city to resort to licenses and license fees for revenue purposes. A provision in its charter, granting power "to license and regulate," does not authorize the city to exact license fees for revenue purposes.

3. A power to license, when specially given in the charter of a city, is nevertheless a police power. The exaction of license fees for revenue purposes is the exercise of the power of taxation.

4. The distinction between the power to license as a police regulation and the same power as a revenue measure is of the utmost importance.

If granted with a view to revenue, the amount of the tax, if not limited by the charter, is in the discretion and judgment of the municipal authorities; if given as a police power, it must be exercised as a means of regulation only, and cannot be used as a source of revenue.

5. The city of Hoboken has no power under its charter, by ordinance, to compel the North Hudson County Railway Company to take out licenses and pay an annual license fee of $15 for every one-horse car and $25 for every two-horse car which the company shall run upon its tracks.

On *certiorari.* In matter of city ordinances.

This writ brings up for review four ordinances of the mayor and common council of Hoboken, adopted on these respective dates: July 27th, 1861; December 5th, 1861; November 9th, 1875, and July 3d, 1877. The first-named ordinance contains ten sections, the major part of which was devoted to prescribing the mode in which street railways should be laid, and how the cars should be run. One section provided for a license, and fixed the license fee to be paid. This ordinance was amended by the subsequent ordinances.

The argument of the counsel of the prosecutor was directed to the validity of the parts of these ordinances which require the taking out of the licenses and the payment of license fees. The sections on this subject, as they now stand, after the amendment of July 3d, 1877, are in the following words:

"1. It shall be the duty of any person or persons, or corporation, and also of every company which has heretofore laid or shall hereafter lay rails through any of the streets of the city of Hoboken, for the purpose of running horse cars thereon, to pay yearly and every year to the corporation of Hoboken the sum of $15 for every one-horse car, and $25 for every two-horse car which they shall run or cause to be run on such tracks, as a license fee.

"2. If any one-horse car or two-horse car shall be run upon any track within this city without a license having been first obtained for that purpose, the owner or owners of such car shall be liable to the payment of a penalty of $5 for

every time such car shall be run without such license as aforesaid."

The prosecutor has refused to take out the licenses required by the ordinances on two grounds. First, that the city had no right to require the company to do so; and second, that if the city had such right, the money required to be paid to procure the licenses was an oppressive exaction and tax upon the prosecutor, which the city had no power to impose, and said ordinances were unreasonable and void. Actions have been brought for the penalties consequent on such refusal, which are still pending.

Argued at November Term, 1878, before Justices DALRIMPLE, DEPUE and SCUDDER.

For the plaintiff, R. Gilchrist.

For the defendant, J. C. Besson.

The opinion of the court was delivered by

DEPUE, J. The North Hudson County Railway Company was incorporated originally under the name of the Hoboken and Weehawken Passenger Railway Company. Pamph. L. 1860, p. 63. It acquired its present corporate name by the act of 1865. Pamph. L., p. 606. By several acts of the legislature, numbering twenty in all, each of the average length of acts granting corporate privileges, it became invested with all the franchises, powers, privileges and property of the Hoboken and Weehawken Horse Railroad Company, the West Hoboken and Hoboken Passenger Railway Company, the Jersey City and Hoboken Horse Railroad Company, and the Hoboken and Hudson City Horse Car Railroad Company, and, so far as the city of Hoboken is concerned, with the franchises of the Bergen Turnpike Company, besides having additional franchises granted to it in its present corporate name. The statement of the case agreed on, and the information con-

tained on the map used at the argument, make an extended statement of the foregoing legislation unnecessary.

Under these legislative privileges, twelve and three-quarters miles of railway have been constructed, of which four and three-quarters miles are within the city of Hoboken. No consent of the city was prescribed in .any of these acts as a condition on which the prosecutor or any of the several corporations it represents, were to be permitted to lay their tracks and enjoy the franchises granted.

By the act of 1874, the prosecutor was authorized to keep, maintain, and operate, in its own name and right, the various lines of street railways which were laid and operated by itself, or either of said companies, and to take the tolls and fares that either of said companies might have taken. *Pamph. L., p.* 1266, § 2. All of the prosecutor's tracks and railroads in Hoboken were laid before the act of 1874, either by the prosecutor or its said predecessors, except the tracks "necessary and convenient to reach the elevator then in course of construction," which were laid under the second proviso and exception in the third section of that act. The tracks necessary to reach the elevator were laid through Ferry street, above its junction with Newark avenue, and for a short distance through Paterson avenue; but the consent of the city to the laying of such tracks along any street or highway was not required, where they were necessary or convenient to reach the elevator then being constructed. *Pamph. L., p.* 1266, § 3.

The result of this legislation is that the prosecutor holds its franchises as a carrier of passengers, and is authorized to keep, maintain, and use its tracks for that purpose, by express legislative sanction. The question is, how far, and under what circumstances a municipal corporation, in virtue of its corporate powers, may regulate the enjoyment of, and impose conditions on the exercise of the franchises of a private corporation specially conferred on it by the legislature.

A municipal corporation, under the ordinary powers of local government, in virtue of its control over its streets, may adopt reasonable regulations for the government of the city,

for the preservation and safety of its streets, and for the maintenance of good order. The provisions in these ordinances, requiring the tracks to conform to grade, and to be laid under the direction of the street commissioner; for keeping in repair the space within the rails; requiring bells to give warning of the approach of the cars; providing for the removal of snow, and the like, are of the character of regulations which may be adopted, and, if reasonable, are valid. Such regulations do not appreciably interfere with the exercise of its franchise by a corporation having the franchise to use the public streets for its business; they are necessary for the good government of the city, and the legislature is presumed to have intended, when it authorized the use of the public streets for such purposes, that its grantee should hold its privileges subject to such regulations as are reasonably necessary for the common use of the streets for the purposes of a street railway, and for ordinary travel.

But an ordinance requiring a license as the condition under which a railway company shall be permitted to run its cars, and exacting a license fee therefor, is quite a different thing. Its effect is to interdict the enjoyment, by the company, of its franchises, except on terms and conditions which the legislature, in its charter, has not imposed. The legal definition of a license is a right given by some competent authority to do an act which, without such authority, would be illegal. *Bouvier Law Dic., tit. "License."* The prosecutor did not need any authority from the city goverment to legalize the running of cars and operating its railroad. Adequate authority for that purpose was derived from the several acts of the legislature relating to this company. If the city has power to impose a new and additional condition under which the company shall be permitted to do what the legislature has expressly authorized it to do, the power of the city in the premises must be found in some provision in its charter expressly empowering it to impose such conditions on corporations situate as this corporation is—corporations having special privileges to oper-

ate street railroads without any license or permission of the city authorities being required.

The city claims the power to compel the prosecutor to take out licenses for each of its cars, and to pay therefor the prescribed license fees, under the eleventh section of the supplement to the city charter, approved March 15th, 1861, (*Pamph. L., p.* 526,) and under the second section of the supplement of 1866. *Pamph. L., p.* 1046.

The eleventh section of the supplement to the city charter of 1861 provides: "That it shall be lawful for the council, by general ordinance, to grant permission to any person or persons, or corporation, to lay railroad tracks and run rail cars thereon, in or over any street or highway within said city, under such licenses, conditions, and restrictions as the said council may think proper, and to alter, change, or revoke the same at pleasure; provided that no such grant or permission shall be made or given until a majority of the property owners along the line of such street or highway shall have first given their consent, in writing, for such railway track to be laid."

It is manifest that this section is inapplicable to the prosecutor. It provides for a grant by the common council, by general ordinance of permission, to any person or persons, or corporation, to lay railroad tracks and run rail cars thereon, in or over any highway or street of the city. The purpose of this provision was to enable the city to confer the privilege of such use of its streets on private individuals or corporations engaged in manufacturing or other business, for their own private use. It gave no power to take tolls, or to engage in the carrying business, and it required the consent of adjacent owners to the laying of tracks. The conditions and restrictions the common council was authorized to impose, were those which should be annexed to such a grant, and would apply only to individuals and corporations holding their right to lay rails under a grant from the common council. This is plainly implied in the use of the words "conditions and restrictions," which import simply a qualification or

limitation of the gift to which they are annexed. The language of the section is entirely inapplicable to a corporation possessing its franchises, and its power to lay rails, under an authority derived from another source, as from the legislature. This, evidently, was the construction of this section by this court in *State* v. *Hoboken*, 1 *Vroom* 225. The observations of the learned judge who delivered the opinion of the court in that case, with regard to the prospective operation of the section, had reference to the fact that the Hoboken and Weehawken company had once obtained a grant of this kind from the city, which had been superseded by a subsequent grant by the legislature. This prosecutor has no subsisting grant of a privilege in this respect from the city. It needs none. Its rails are down and in use, under legislative sanction. *Mayor, &c., of Jersey City* v. *J. C. & B. R. Co.*, 5 *C. E. Green* 360.

If the city has the power contended for, it must have been derived from the second section of the supplement to the city charter of 1866. That section gives the common council power to pass ordinances "to license and regulate cartmen, hackmen, auctioneers, common criers, hawkers, peddlers, junkshop dealers, junk dealers, venders, porters, hucksters, city railroad cars, dealers in second-hand articles, and scavengers, and to fix the rate of compensation to be allowed to them, and to prohibit unlicensed persons from acting in such capacities, and to locate, regulate, and remove slaughter-houses and petroleum refineries."

This section may have force and effect, if taken in connection with that part of the city charter just considered, so as to authorize the common council to license such railroad cars as are run under grants made by the city; but it is by no means clear that it should be construed to be effective against a corporation having in its charter special powers to lay rails and operate its railroad. The power to license is the power to make legal, acts which would otherwise be unlawful; and, as a police power, it incidentally includes the authority to prescribe the qualifications and restrict the number of persons who shall engage in the business or occupations to be licensed,

and thus to limit the extent to which such business shall be prosecuted. As against a corporation endowed by the legislature with the privilege of conducting the business for which it was incorporated, as its managers should judge prudent, authority lodged in another body to supervise its business and abridge its capacity to conduct it, must necessarily tend to impair the franchises it holds under its incorporating act. The charter of a city is, in its nature, a general law in force within the corporate limits, and no canon of construction is more firmly established than that a general statute will not supersede or repeal a statute conferring special privileges, unless there be clear language expressive of such an intent. The charter of a private corporation created for purposes of business or trade, will not be modified, altered, or impaired by a statute creating a public municipal corporation, unless the intent to effectuate that purpose is plainly to be deduced from the language employed by the legislature. *State* v. *Jersey City*, 5 *Dutcher* 170. The charter privileges of the prosecutor may stand in their entirety, and this section of the city charter may still have effect. Construed in connection with the eleventh section of the supplement of 1861, it is not necessarily brought in conflict with the special rights and privileges granted to the prosecutor in its incorporating acts.

But if it be assumed that under this section the city may compel the prosecutor to take out licenses, the license fees imposed by these ordinances are not such as lawfully may be exacted.

The distinction between the power of taxation for revenue and police powers which are granted for the maintenance of order and the administration of the internal affairs of a municipality, is pointed out in *State, Benson, pros.,* v. *Hoboken*, 4 *Vroom* 280. Under a power simply to regulate, an ordinance cannot be passed to tax for revenue purposes. In the course of the administration of such a power the public treasury may be incidentally benefited by the imposition of fines and penalties, but in all such cases it must appear that the means adopted are such as are reasonably necessary to accomplish the purpose

of a regulation. Under such a power the right of taxation for raising revenue is not conferred. In *State* v. *Hoboken, supra,* an ordinance requiring the owner of a lot abutting on a street to pay for a permit to erect a vault in the street the sum of twenty cents for every square foot of space occupied by such vault, if attached to a private house, and forty cents if attached to a shop or store, or if used for business purposes, was held to be illegal under a charter authorizing the city to pass ordinances to regulate the building of vaults. In *Kip* v. *City of Paterson,* 2 *Dutcher* 298, an ordinance requiring all persons who should sell hay or other produce within city limits to pay a fee of five cents, was held to be without warrant of law under a charter empowering the city council to pass ordinances for regulating the general police of the city. In *Dunham* v. *Trustees of Rochester,* 5 *Cow.* 462, an ordinance requiring hucksters and others to take out a license, and to be taxed therefor a sum from $5 to $30, at the discretion of the president of the council, was held to be invalid under an act of incorporation which authorized the trustees of the village to make such prudential by-laws, rules and regulations as they might deem proper, relative to taverns, gin shops and huckster shops. A charter granting power to make regulations as to the use of omnibusses and stage coaches for the transportation of persons for hire, does not authorize an ordinance requiring a license and the payment of license fees ranging from $1 to $25; such a requisition of money operating as a direct tax upon the vehicle used. *Com.* v. *Stodder,* 2 *Cush.* 562.

Nor can the authority of a municipal corporation to exercise what, in substance, is the power of taxation, be deduced from a grant of power to license specifically. A power to license is of the same nature as a power to regulate. Under a charter authorizing the regulation of a business or occupation, an ordinance compelling persons engaged in such business or occupation to take out licenses may be adopted if a license is an appropriate method of regulating the prosecution of the business. *Burroughs on Taxation* 392. And if the power to license is given in express words, it nevertheless is included

in the classification of police powers. The exaction of a license fee for revenue purposes is clearly an exercise of the power of taxation, and cannot be sustained, unless the charter plainly shows an intent to confer that power. *Cooley on Const. Lim.* 201 ; 1 *Dillon on Mun. Corp.*, § 291. An act incorporating a city, which gives the city court exclusive jurisdiction to license inn-keepers within the city limits, does not authorize the imposition of a tax on inn-keepers for the license issued. *Freeholders of Essex* v. *Barber*, 2 *Halst.* 64. The decisions of the courts speak with almost entire unanimity in denial of the ability of municipal governments to use the power of licensing as a revenue measure, unless a legislative intent is manifested that such power may be used for that purpose. The cases cited by the defendants' counsel do not establish a different doctrine. In *Boston* v. *Schaffer*, 9 *Pick.* 415, the power to exact money for a license was derived from the words of the charter, and a legislative construction put on them in another statute. In *Chilvers* v. *People*, 11 *Mich.* 43, a license fee for a ferry privilege, with a view to revenue, was sustained on the ground that the city charter authorized the common council to direct the manner of issuing and registering the license, and "to prescribe the sum to be paid therefor into the treasury of the corporation." The court expressly held that these last words, " to prescribe the sum of money to be paid therefor into the treasury of the corporation," showed a clear intent to make licenses a source of revenue to the city. In *Frankford, &c., Railway Co.* v. *City of Philadelphia*, 58 *Penna. St.* 119, the ordinance under review, requiring passenger cars to be licensed, and the payment of a stipulated sum for each car, was passed under a charter which authorized the city council to issue the licenses, " and to charge a reasonable annual or other sum therefor." The only questions considered by the court were, whether this provision in the charter applied to passenger railway cars, and whether the license fee prescribed was reasonable in amount. The later case, in the same court, was decided upon a similar or-

dinance passed under the same charter. *Johnson* v. *Philadelphia,* 60 *Penna. St.* 445.

The distinction between the power to license, as a police regulation, and the same power when conferred for revenue purposes, is of the utmost importance. If the power be granted with a view to revenue, the amount of the tax, if not limited by the charter, is left to the discretion and judgment of the municipal authorities; but if it be given as a police power for regulation merely, a much narrower construction is adopted; the power must then be exercised as a means of regulation, and cannot be used as a source of revenue. *Cooley on Taxation* 408;. *Cooley on Const. Lim.* 201.

What license fee may be exacted under the power of licensing, as a mere police power, is a subject on which there is a diversity of views. Chief Justice Cooley places it within the limit of the necessary or probable expense of issuing the license, and of inspecting and regulating the business the license covers. *Cooley on Taxation* 408. Judge Dillon makes a distinction between useful trades and employments and amusements, exhibitions, &c.; with regard to the former, he says, under a power to license the limit is a reasonable fee for the license and the labor attending its issue; but with respect to the latter, the authority of the corporation as to the amount of the charges, has been regarded as greater than in relation to trades and occupations. 1 *Dillon on Mun. Corp.,* § 291. But both these eminent jurists agree that a fee· exacted under a grant of power to license, which exceeds in amount the limitation they adopt, is unwarranted and illegal, unless there be superadded words evincing a legislative intent that the power may be applied as a mode of taxation.

The authority to license granted to the city by the second section of the supplement of 1866, is plainly a grant of that power for mere police purposes. It is given solely in the words "'to license and regulate," from which it must be intended that regulation is the object, unless there be something in the language of the grant, or in the circumstances under which it was made, indicating with sufficient certainty that

the raising of revenue by means thereof was contemplated. *Cooley on Taxation* 408. There is no language in this charter indicative of such an intent, nor anything from which it may be inferred that the city was authorized to resort to taxation for revenue, to other subjects of taxation than such as are usually the subjects of taxation. Furthermore, the collocation of trades and employments in the same connection indicates that regulation and not taxation was the object contemplated.

It is also equally clear that taxation and not regulation was the motive that induced the adoption of these ordinances. A fee of $1 is provided for as the cost of issuing the license, and in addition thereto a license fee is imposed of $15 for every one-horse car, and $25 for every two-horse car which shall be run. The sum payable by the prosecutor under this tariff of charges, appears by the testimony to be $1745 annually. There is nothing made apparent in the case to show that this sum would be a reasonable compensation for inspecting and regulating the company's business. Indeed the ordinance, in its several parts, specifically provides for the doing by the company of almost everything that can be regarded as a regulation of its business; and adequate penalties may be imposed for defaults in that respect. For the sum of money to be paid as license fees the company gets nothing but a license to run its cars, a privilege it possesses under its legislative grants without the consent of the city. A license fee beyond the reasonable fee for issuing the licenses imposed under such circumstances, is taxation for revenue purposes, and is not the legitimate exercise of the power of licensing under the authority given to a city for police purposes. *Mayor, &c., v. Second Av. R. R. Co.*, 32 *N. Y.* 261.

Following the precedent established in *State v. Jersey City*, 5 *Dutcher* 170, the prosecutor is entitled to have the ordinance, so far as it affects it, set aside on *certiorari*.