## MAXY C. ALLOR, RELATOR v. THE BOARD OF AUDITORS OF THE COUNTY OF WAYNE.

*Construction of statutes—Local self-government—Constables.*

The validity of particular provisions in a statute cannot properly be decided unless expressly involved in a case, and are not passed on where the only questions concern other provisions in the law.

Courts cannot lawfully be subjected to executive or ministerial interference in the exercise of their functions, and should not submit to it or receive directions for any purpose except from such other courts as by the Constitution have superintending control over inferior courts.

Judicial power in Michigan can be vested only in courts and judicial officers, and all the judges and judicial officers must be elected directly by the people of the State or of the local districts.

Due process of law for the restraint of personal liberty requires a warrant issued by a court or magistrate upon a proper showing or finding, except in cases of reasonable belief of treason or felony, or breach of the peace committed in the presence of the officer.

Municipal government, under the Constitution of Michigan, must be managed by popular representatives and agencies deriving their authority from the inhabitants, and no municipal business can be controlled by State or other outside authorities.

A statute is to be construed in view of its title and its lawful purposes, assuming as far as possible that broad language should be confined to lawful objects, and inferring no unlawful intent except where too plain to be mistaken.

Justices of the peace in Michigan have constitutional jurisdiction in civil cases, and are necessary magistrates in cities, as well as outside of them; their criminal jurisdiction is given them by the general statutes, but is to some extent contemplated by the Constitution, and in cities can only be restrained by the special municipal criminal jurisdiction.

Municipal courts cannot be authorized to try extra-municipal crimes; and justices of the peace in Detroit have power under the general laws of the State to dispose of all criminal business arising in Wayne county outside of the city.

The power to examine and commit persons charged with crime is not judicial, but is one of the duties of conservators of the peace, and it may be vested in other persons than courts; and those in whom it is vested by the Constitution cannot be deprived of it by legislation.

Officers named in the Constitution are there contemplated as having a known legal character, and though their duties may sometimes be varied, by legislation, they cannot be so changed as to destroy the powers of the office or to essentially alter it.

The Metropolitan Police force of Detroit, so far as lawfully constituted, is merely an additional force of constables and watchmen appointed by the State for certain limited purposes. It cannot supersede the local peace officers for all common law purposes.

Constables in Michigan are local peace-officers, ministerial officers of justices of the peace, and bailiffs of courts of record of criminal jurisdiction in the county. Their power to serve process in civil cases was conferred merely because civil powers were conferred on justices.

Constables are the only peace officers elected by the corporation of Detroit, and they can act within the city as well as elsewhere in the county in serving the criminal process issued by justices, and are entitled to compensation for such service. Their powers cannot be superseded by the exclusive authority to serve process within the city conferred by the Police Act upon members of the Metropolitan Police.

Constables have always been peace officers in the arrest of criminals and the prosecution of crimes and disturbances, and have always been chosen by popular vote for the preservation of peace in the territory of their constituents.

MANDAMUS. Submitted Jan. 23. Granted Feb. 11.

*Maybury & Conely* for relator. Office is the right to exercise a public function or employment, and to take the fees and emoluments belonging to it, both in the case of a salaried office and of those offices that are compensated by fees where the receipt of compensation depends on the exercise of the prerogatives of the office. 2 Bl. Com. 36; 3 Kent's Com. 454; Bouvier's Law Dict. tit. "Office."

The office of *constable* is a most ancient one, and existed at the common law. Of all the offices known to the common law and still preserved, none, save perhaps that of sheriff, has the "grey antiquity" of that of constable. Like many other of the very ancient institutions of the common law, its origin is obscured with the mists of time, but at a very early day in the history of England, prior even to the legal "time immemorial" (A. D.

1189), we find offices possessing at least some of the functions of that of the comparatively short-time-later one of constable; and as early as the reign of King John (A. D. 1215) we find the office of constable, having functions of a bailiff, recognized as a then existing fact. Of the ancient functions and prerogatives of the office of constable, most of which were incident and appertaining to it at the common law, were those of serving and executing various civil and criminal writs, arresting on suspicion, serving and executing criminal warrants issued by justices of the peace, of being the ministerial officer of justices of the peace, of being conservators of the peace, and perhaps some other functions. Before the office of justice of the peace proper was created, which was in the reign of Edward III. (the justices sitting as a court at quarter-sessions before this), constables were the ministerial officers of the inferior and local courts, and executed their writs. Various functions have been from time to time attached to this office, some of a somewhat permanent nature, others more or less temporary, but those above mentioned were the most prominent, and constituted the principal duties of the office of constable. They gave to that office its peculiar characteristics, distinguishing it from other executive or ministerial offices, particularly from that of a mere policeman or patrol. *The function of serving criminal warrants issued by justices of the peace and that of being the ministerial officer of those magistrates,* has from the time the office of justice of the peace was created down to the present day, been a constituent part of the office of constable, and distinguished that office from all other bailiffs. These functions continued to mark that office from at least the reign of Edward III. down through the subsequent history of England to the colonization of America, through the old colonial days to the severance of the relations with the mother country, from that time through the settlement of the Northwest Territory to the erection of Michigan into a State, and through the subsequent his-

tory of the State to the adoption of the Constitution of 1850. They still continue to mark and distinguish the office of constable throughout the entire State of Michigan, except within the limits of the city of Detroit. Among the early allusions to the office of constable, showing the character of that office and some of its powers and functions, are the following from the Magna Charta of King John:

"No sheriff, *constable,* coroner or other our bailiffs shall hold pleas of the crown." "No *constable* or bailiff of ours shall take corn or other chattels of any man, unless he presently give him money for it, or hath respite of payment by the good-will of the seller." "No *constable* shall distrain any knight to give money for castle guard, if he himself will do it in his person, or by another able man, in case he cannot do it through any reasonable cause." "We will not make any justices, *constables,* sheriffs or bailiffs, but of such as know the law of the realm and mean duly to observe it." Creasy on the Eng. Const. pp. 120–147; Lieber's "Civil Liberty and Self-Government" appendix iv. pp. 459–470.

From the foregoing, and notes to chapter xi. of the work of Mr. Creasy, above cited, it will be seen that in addition to the powers of a bailiff and conservator of the peace, and perhaps other powers analogous to those of the later constable, that officer at the time of the Magna Charta, was possessed of the power to levy troops and provisions in the king's name. The Magna Charta was signed by King John, on June 19, A. D. 1215. Edward I. ascended the throne of England about A. D. 1272, and reigned until about 1307. Of this monarch Sir Matthew Hale said:

"It appears that the very scheme, mould and model of the common law, especially in relation to the administration of the common justice between party and party, as it was highly rectified and set in a much better light and order by this king than his predecessors left it to him; so in a very great measure it was continued the same in all succeeding ages to this day; so that the mark or epocha we are to take for the true stating of the law of England, *what it is,* is to be considered, stated and estimated from what it was when this king left it." Hale's Hist. Com. Law 163.

It was during the reign of this king that the Statute of Winchester (13 Edw. I. st. 2 c. 6), the first statute of "hue and cry" was passed. Reeves' Hist. Eng. Law, vol. ii. pp. 121 122 123. This statute recognizes the then and previous existence of the office of constable, and adds to it some powers:

"The Statute of Winchester ordaining every citizen to have armour according to his condition to keep the peace, requires that in every hundred and franchise *two constables* be chosen to make the view of armour twice a year, and that the said constables 'shall present before justices assigned such default as they do see in the country about armour, and of the suits, and of watches and of highways; and also shall present all such as do lodge strangers in uplandish towns for whom they will not answer.' These are the officers known as *high* constables, who are especially charged with the peace of the hundred just as the *petty* constables are charged with the peace of the parish or township." Enc. Britt. title "Constable;" 1 Bl. Com. 411.

In the reign of Edward III., which began about 1327, some additional legislation was had concerning constables.

"The Statute of Winchester, passed in the reign of Edward I., and all laws for the ordering of the police may be treated as ordinances calculated for the better discovery and bringing to justice of suspected persons, that being one of their great objects. It had been ordained by the Statute of Winchester that any stranger passing the country in the night might, upon suspicion, be arrested and delivered to the sheriff. It was now ordained that because many felonies had lately been committed by persons called *roberdesmen, waisters and draw-latches,* any person suspected of being such might be arrested by day or by night by the *constable* of the town (if within a franchise, by the bailiff), and delivered to the sheriff to be kept in prison till the coming of the justices of gaol delivery." Reeves' Hist. Eng. Law vol. ii. p. 322.

Prior to the reign of Edward III. it would seem that the justices of the peace sat for the trial of causes at quarter sessions, but in that reign they were given power to sit alone for the trial of certain offenses, and from that day to the present time they have possessed the

power to sit alone for the trial of causes, the jurisdiction varying somewhat from time to time, though in the main increasing in kind and magnitude. Reeves' Hist. Eng. Law vol. ii. p. 284 et seq. From this time certainly constables have executed the criminal process of justices of the peace, and have been their ministerial officers.

Ben Johnson, who was born about 1574 and died in 1637, makes frequent mention of the office of constable in his dramatic writings. Allusions to this office and some of the functions then appertaining to it, such as arresting for breach of the peace, serving warrants, and executing the directions of inferior magistrates, may be found in "Every Man out of his Humor," act v. sc. 4; "Bartholomew Fair," act ii. sc. 1; act iii. sc. 1, and "The Tale of a Tub," act i. sc. 3; act ii. sc. 1; act iii. sc. 1, sc. 3, sc. 5. Shakspeare was born 1564 and died 1616. His father was high bailiff and chief alderman of his little town. Taine's Hist. of Eng. Lit., title "Shakspeare." His father's office, coupled with his own life and occupation, undoubtedly made Shakspeare tolerably familiar with the functions ordinarily exercised by constables. He alludes to this officer in various portions of his dramatic writings, among others the plays of "Henry IV.," part ii. act v. sc. 4, and "Much Ado about Nothing," act iii. sc. 3. The functions of being a ministerial officer of justices of the peace and the right to arrest on suspicion are recognized.

Writing further of these ancient peace officers, Reeves, in his History of English Law, vol. ii. pp. 328-9, says:

"The peace in the most extensive sense of the word took in, perhaps, the whole of the criminal law; and as most offenses were said to be against the peace, all magistrates who had authority to take cognizance of such offenses might be considered as a sort of guardians of the peace *ex officio;* such were the king's justices, inferior judges, and ministers of justice, as sheriffs, *constables,* tything men, headborough, and the like; all these were *ex officio* guardians and conservators of the peace. * * * The manner in which these officers might exer-

cise their authority was by committing to custody those whom they saw actually breaking the peace; or, as is said, they might admit them to bail or oblige them to give sureties for keeping the peace. This might be done by them all, even down to the *constable*."

We find in the report of Coleman's case, decided in 16 Jac. I. Hil. Term. B. R., that constables not only might serve the warrants of justices of the peace, but were indictable for refusing to execute them.

"Nota que Coleman & auters constables de Chichester fueront indicted pur le refusing d'execute le garrant d'un justice de peace, que fuit directed a eur d'apprehend un pur contempt & l'indictment sur cest, matter fuit allowed:" 2 Roll Rep. 78.

Of the office of constable, Sir Matthew Hale, who died before 1680, writes:

"For the office of constable is of two-fold extent. I. Ministerial and relative to justices of the peace, coroners, sheriffs, etc., whose precepts he ought to execute, or in default thereof he may be indicted and fined. 2. Original and primitive, as he is a conservator of the peace at common law:" Hale P. C. (1st Am. ed.) pp. 88 to 97 and notes.

Writing of warrants issued by justices of the peace the same learned judge says:

"But if it be directed to a known officer, as to the sheriff, who is a known officer in the county, or *to a constable, who is a known officer in the vill*," etc.; Ibid. p. 116.

Hawkins, in his Pleas of the Crown, published in 1716, writes of this ancient office of constable and its functions as follows:

"And first, as to the antiquity of the office of constable, it seems to be the better opinion, that both constables of hundreds which are commonly called high constables, and also constables of tythings, which are at this day commonly called petit constables or tything men, and were anciently called chief pledges, *were by the common law*, and not first ordained by the statute of Winchester, cap. 6, as it is holden by some that they were, for that statute doth not say that there shall be such officers constituted, but clearly seems to suppose that there were such officers before the making of it. As to the nature of this office there seems to be no doubt but that the original institution of it was for the better preservation of the peace; for which purpose a constable is said to be

authorized by the common law to arrest felons, and also all suspicious persons that go abroad in the night and sleep by day, or resort to bawdy-houses, or keep suspicious company, and to suppress affrays. And to the same end also, it seems, that he ought by the ancient common law, to present at the Torn or Leet all those within his precinct who have not been admitted into some tything and sworn to the king's allegiance; and it seems that he still ought, by the law in use at this day, to present all offenses inquirable at the Torn or Leet; yet, in the oath set down by Kitchin, he only swears to present all bloodsheds, outcries, affrays and rescouses done within his office. Also, it is said that a constable was at the common law a subordinate officer to the conservators of the peace, and consequently, since the office of such conservators hath been disused and justices of the peace constituted in their stead, *it hath been always holden that the constable is the proper officer to a justice of the peace, and bound to execute his warrants*, and therefore it hath been resolved that when a statute authorizes a justice of the peace to convict a man of a crime and to levy the penalty by warrant of distress, without saying to whom such warrant shall be directed, or by whom it shall be executed, the constable is the proper officer to serve such warrant, and indictable for disobeying it." Vol. ii. pp. 61-2; and cases cited.

Blackstone, in his commentaries, the lectures composing which he commenced to deliver in 1758, uses the following language concerning the office under discussion :

"*Constables*, tything men, and the like, are also conservators of the peace within their own jurisdictions, and may apprehend all breakers of the peace and commit them till they find sureties for their keeping it." Vol. i. p. 350. "The *constable*, of whose office we formerly spoke, hath great original and inherent authority with regard to arrests. He may, without warrant, arrest any one for a breach of the peace committed in his view, and carry him before a justice of the peace. And in case of felony actually committed, or a dangerous wounding whereby felony is likely to ensue, he may, upon probable suspicion, arrest the felon, and for that purpose is authorized (as upon a justice's warrant) to break open doors, and even to kill the felon, if he cannot otherwise be taken; and if he or his assistants be killed in attempting such arrests, it is murder in all concerned." Vol. iv. p. 292. See also 2 Hale's P. C. 88, 89. "Fourthly, then, of the constable. The word *constable* is frequently said to be derived from the Saxon *koning-stapel*, and to signify the

support of the king.   But as we borrowed the name, as well as the office of constable, from the French, I am rather inclined to deduce it, with Sir Henry Spelman and Dr. Cowel, from that language, wherein it is plainly derived from the Latin *comes stabuli*, an officer well known in the empire, so called because, like the great constable of France, as well as the lord high constable of England, he was to regulate all matters of chivalry, tilts, tournaments, and feats of arms which were performed on horseback.   This office of lord high constable hath been disused in England, except only upon great and solemn occasions, as the king's coronation and the like, ever since the attainder of Stafford, duke of Buckingham, under King Henry VIII., as in France it was suppressed about a century after by an edict of Louis XIII.; but from his office, says Lambard, this lower constableship was first drawn and fetched, and is, as it were, *a very finger of that hand.*   For the statute of Winchester, which first appoints them, directs that, for the better keeping of the peace, two constables in every hundred and franchise shall inspect all matters relating to *arms* and *armour.* Constables are of two sorts, high constables and petty constables.   The former were first ordained by the statute of Winchester, as before mentioned, are appointed at the court leets of the franchise or hundred over which they preside, or, in default of that, by justices at their quarter-sessions, and are removable by the same authority that appoints them.   The petty constables are inferior officers in every town or parish subordinate to the high constable of the hundred first instituted about the reign of Edward III.   These petty constables have two offices united in them—the one antient, the other modern.   Their antient office is that of headborough, tything-man, or borsholder, of whom we formerly spoke, and who are as antient as the time of King Alfred—their modern office, as that of constable merely, which was appointed, as was observed, so lately as the reign of Edward III., in order to assist the high constable.   The general duty of all constables, both high and petty, as well as of other officers, is to keep the king's peace in their several districts, and to that purpose they are armed with very large powers of arresting and imprisoning, of breaking open houses and the like."   Vol. i. pp. 355-6.

It would seem that Blackstone intended to convey the impression that the office of constable originated with the statute of Winchester, and Coke, in 4 Inst. 267, seems to take that view.   I think, however, that the weight of history is the other way, and that it is quite clear that

the office of constable existed at the common law prior to the statute of Winchester. In addition to the authorities above cited, Mr. Chitty, in a note to an edition of Blackstone's Commentaries, says:

"Constables have been known as most efficient public officers long before the statute of Winchester: 13 Edw. I., st. 2, c. 6, A. D. 1285. This is evident from a writ or mandate preserved in the adversaria to Watt's edition of Matthew Paris, and from which cc. 4, 6, of the statute of Winchester are evidently taken, though it has, says Sir Thomas Tomlins, escaped the notice of every writer or speaker upon the subject."

Sir Matthew Hale also insisted that constables were of the common law, and that the statute of Winchester only gave some special and additional functions. 2 Hale P. C. (1st Am. ed.) p. 88 et seq. This same learned judge also so held in a case decided by him. Hawkins, cited above, fully sustains this view.

In 1 Salk. p. 175 occurs the following, under title "Constable:"

"The high constable was an officer at common law before the statute of Winton, as well as petit constable, and they are officers to the justices of peace, as the sheriff is to the court of King's Bench."

On page 380 of the same volume, the decision in the case of *Queen v. Wyat* is reported. This was by Lord Chief Justice Holt. In that case the court said:

"1st, Though the constable is not named in the statute, nor appointed to be the officer to execute these warrants, yet the justices may command him to execute them; for as at common law the constables were subordinate officers to the conservators of the peace, so are they now the proper officers of the justices: The constable of the hundred may arrest for breach of the peace as well as a petit constable, 3 Cro. 378, and was an officer at common law, notwithstanding the opinions to the contrary; and the statute of Winton only enlarges his authority. *Vide* Hale's Pleas of the Crown, 3 Keb. 231." "2dly, Where an officer neglects a duty incumbent on him, either by common law or statute, he is for his default indictable. *Et nota;* In this case, the indictment was not laid *contra formam statuti*, nor need it have been, though the constable had been named in the statute; because the constable is an officer of common law, and

when a statute requires him to do what without requiring had been his duty and he must have done, it is not imposing a new duty, and he is indictable at common law for it. *Vide* also 5 Vin. Abr. 427–8 title 'Constable;' Powell J. in 2 Ld. Raym. 1189."

Having thus reviewed the origin of this office, its history and its functions and prerogatives in England, and having seen that the service of the criminal warrants of justices of the peace and being the ministerial officers of such magistrates, were of the peculiar attributes of the office of constable by the common law, the *status* of that office in the American colonies and the states of the Union properly comes next in order for consideration. The office of constable seems to have existed in the early colonies as a matter of course. While it is probably correct to say that this office did not exist in Plymouth colony on December 25th, 1620, the day the originators of that colony disembarked from the May Flower, yet it is historically true that it has been in existence from the settlement of New England to the present time. The colonists organized a body politic before they landed, and in a few years thereafter we find the office of constable in full existence. The May Flower dropped her anchor in the roadstead of what is now Provincetown, on Cape Cod, November 11th, 1620. A journal of the proceedings on board says:

"This day, before we came to harbor, observing some not well affected to unity and concord, but gave some appearance of faction, it was thought good there should be an association and agreement that we should combine together in one body, and to submit to such government and governors as we should, by common consent, agree to make and choose, and set our hands to this that follows, word for word."

The following was the instrument which they executed:

"In ye name of God, Amen. We whose names are underwriten, the loyall subjects of our dread soveraigne lord, King James, by ye grace of God, of Great Britaine, Franc and Ireland, king, defender of ye faith, etc., having undertaken, for ye glorie of God and advancemente of ye Christian faith and honour of our king and countrie, a voyage to plant ye first colonie in ye north-

ern part of Virginia, doe by these presents solemnly and mutually, in ye presence of God and one of another, covenant and combine ourselves together into a civill body politick, for our better ordering and preservation and furtherance of ye ends aforesaid, and by virtue hearof to enacte, constitute, and frame such just and equall laws, ordinances, acts, constitution and *offices*, from time to time, as shall be thought most meete and convenient for ye generall good of ye colonie, unto which we promise all due submission and obedience. In witness whereof we have hereunder subscribed our names, at Cap Codd, ye 11 of November, in ye year of ye raigne of our soveraigne lord King James, of England, France, and Ireland ye eighteenth, and of Scotland ye fiftie-fourth, Ano. Dom. 1620." Bryant's Hist. U. S. vol. i. p. 388-9.

We see here, at the beginning of permanent civilized life on this continent, not only the contemplation of and provision for civil offices among the colonists, but also the practical application of the principle of local self-government, a principle of Anglo-Saxon derivation which, surviving the Norman Conquest, has always obtained, to a great and increasing extent, in England, and has ever been one of the fundamental principles of civil liberty in the rise, growth and progress of governments and governmental institutions in America.

We find that as early as 1623 the holding of "town meeting" in the spring for the election of officers and the transaction of other business had become established. Bryant's Hist. U. S. vol. i. p. 408. By 1632 the various settlements had formed into townships, and these had become an aggregated commonwealth. Ib. pp. 538-9. It was about this time that Eliot began his efforts to Christianize the Indians, and some of the converts were made magistrates and *constables*. Ib. p. 540.

It is fair to infer that this office had previously become fully established among the colonists. The following was a *warrant* addressed by an Indian magistrate to a constable:

"1. I, Hidondi. 2. You, Peter Waterman. 3. Jeremy Wicket. 4. Quick you take him. 5. Fast you hold him. 6. Straight you bring him. 7. Before me, Hidondi."—*The New England History*, by Charles W. Elliott, vol. 1 p. 326.

An incident in the history of the Massachusetts Bay colony serves to show the existence of this office and its functions. In 1651 the Rev. John Clark, a Baptist minister from Newport, the Rev. Obadiah Holmes, another Baptist minister, and one Crandall, went together to Lynn as representatives of the church at Newport, to visit one William Witter, a sick brother in the church, who was nearly seventy years of age and blind. While there the following is related of them:

"On Sunday after their arrival, 'not having freedom in our spirits,' says Clark, 'for want of a clear call from God to go unto the public assemblie to declare there what was the mind, and counsel of God concerning them,' he 'judged it a thing suitable' to hold divine service in the house and with the family of Witter, and four or five others who came in to join their worship. While thus engaged, there came in *two constables* with a *warrant* for their arrest. A request to finish the services was denied, and 'the erroneous persons being strangers,' whom the writ of Justice Bridges commanded should be brought before him in the morning, were marched off as prisoners—bail being refused—to the inn for safe keeping."— Bryant's Hist. U. S. vol. ii. p. 106.

In the same work, p. 180, is related an incident in the Plymouth colony in 1653, where the inhabitants would not permit the constable to take Nicholas Upshall on his warrant, who was charged with favoring Quakers. In New Hampshire, in 1662, it was ordered that a cage be made by the selectmen "to punish such as sleepe, or take tobacco on the Lord's Day out of the meeting in time of publick exercise," and that "one householder or more walk every Sabbath day in sermon time with the *constable* to every publick house in ye town, to suppress ill order, and if they think convenient, to private houses also." Bryant's Hist. U. S. vol. ii. p. 424. In the same work, on page 425, an incident is related as happening in New Hampshire in 1662, where Walter Barefoot prevailed upon a *constable* to surrender his warrant of execution against three Quaker women sentenced to be publicly whipped at the cart's tail through the town. See also same work, p. 469, for an account of the Rev. Stephen Burroughs being driven out of Salem

and afterwards arrested on a charge of witchcraft by *two constables* sent from that town.

In the early resolves of the Massachusetts Bay colony there are some, though few, allusions to the office of constable. There are no provisions creating that office, and those referring to it seem to indicate the office as existing with the ordinary functions appertaining to it. This office is in this country, unquestionably, by the common law, and would, without special enactment, possess those functions and prerogatives which go to make up that office and commonly appertain to it. In the colonies as in England, the functions which, among others, gave peculiar character to the office of constable were those of serving the criminal warrants of justices of the peace and of being their ministerial officer. They have continued to mark this office in the several States where the office has existed, not only in New England, but outside of it, in some of the original States and in many of those States which have come into existence as such since the formation of the Federal Union.

In the earliest state constitution of Connecticut, in that of New Jersey, adopted in 1776, in that of New York, adopted in 1777, and in that of Georgia, also adopted in 1777, this office is mentioned and continued, but alluded to by name only, as having a well understood signification. Webster in defining in his dictionary the word "constable," says:

"In the United States, constables are town and city officers of the peace, with powers similar to those possessed by constables in Great Britain. They are invested also with powers to execute civil as well as criminal process and to levy executions."

The foregoing definition would seem to involve an idea which is to a certain extent true, namely: that if anything can be said to have been added to the office of constable, it is the power to execute *civil*, not criminal, process, which latter would be a natural concomitant, certainly a necessary outgrowth of an office existing for the preservation of the peace and the like, and itself an

outcome of a rude and disturbed state of society. Constables being original peace officers, and having as functions of their office those involved in this case, namely, of serving criminal warrants of justices of the peace, and of being their ministerial officer, would very naturally have conferred by common consent or by statute the function of executing civil process when such justices should have conferred on them jurisdiction of civil causes. The function of serving civil would follow, not lead, that of serving criminal process of justices of the peace. Mention is made of this to illustrate that, in depriving a constable of the functions of that office, as attempted by the Police Act in respect to those herein involved, there are taken from that office what has ever constituted, above all others, its peculiar and original characteristics; and that a much greater inroad, a far more striking and radical change in the constitution of that office is thereby made, than there would be if the entire function of executing civil process were swept away.

This brings us to a consideration of the constitution of the office of constable in Michigan. This office, in respect to those of its functions involved in this case is, in this State as at the common law in England and the colonies. It has not been modified by legislation. The statutes, while pointedly referring to the functions last mentioned, and perhaps intensifying those peculiarities, are really declaratory. The prerogatives of this office involved in the present controversy have ever formed in Michigan a constituent part thereof. A glance at the legislation concerning it will verify this statement.

Among the early legislation relative to this office was an act passed Nov. 3, 1815, providing for the appointment of a competent number of *constables* in the judicial districts of the territory, who should have same powers and emoluments as marshals. It was also provided in this act that *sheriffs and coroners* should be the ministerial officers of all courts within their respective counties, *except those of justices of the peace.* 1 Terr. L. 220. On

Nov. 4, 1815, provision was made for the punishment of persons unlawfully resisting constables, etc. Ib. 124. On May 8, 1820, the county commissioners were authorized to divide counties into townships, and to recommend persons to the Governor for appointment as constables. The Governor was required to appoint a suitable number of constables. Ib. 661-671. In the same year, on May 11, constables were authorized to execute judgments of justices of the peace in criminal cases, and forms of writs were prescribed. Ib. 598-99. A few days later, May 20, an act was passed defining the powers of constables in civil cases, and prescribing the forms of writs. They were prohibited from advocating causes before justices of the peace. Ib. 604, 619. On Nov. 28, 1820, a general act concerning constables was passed. After providing for their appointment and other things, the following was enacted:

Section 5. And be it further enacted, That constables shall be *the ministerial officers of justices of the peace in their respective counties;* and it shall be the duty of constables to apprehend and bring to justice, all felons and disturbers of the peace; to suppress riots, and give information of all offences against the laws, which may come to their knowledge: they shall also keep and preserve the peace in their respective counties; *and the authority of constables, in civil and criminal cases, shall be co-extensive with the counties, for which they may be respectively appointed, within which they shall serve such process as may be directed to them, agreeably to law:* And they shall attend upon the Supreme Court and county courts in their respective counties, when thereto warned by the order of such courts, and shall do and perform such other services as are or may be required by law.

Section 7. * * * The same being adopted from the laws of three of the original states, to wit, the states of Massachusetts, New York and Ohio, as far as necessary and suitable to the circumstances of the territory of Michigan. Ib. pp. 683-6.

On June 29, 1832, the Legislative council passed an act amending an act relative to the city of Detroit. This provided, among other things,

"That hereafter the constables of the city of Detroit, while in office, shall be respectively vested with the same

power and perform the same duties which may be vested in and performed by any constable of the county of Wayne, and shall be subject to the same fees and take the same oath."

There was no important legislation after this concerning constables, except as to fees (Ib. p. 778), until Michigan became a State. The functions of this office, as indicated by section five of the act of 1820, have ever attached to and formed a component part of it in Michigan. Rev. Stat. 1838, pp. 66, 210, 398; Rev. Stat. 1846, p. 93; Comp. L. 1857, p. 241; Comp. L. 1871, p. 287.

This somewhat extended review of the origin, history, and functions of the office of constable brings us to 1850. It covers a period of over seven centuries. Whatever may have been the origin of this office, we find, beyond question, that for *more than five hundred years* continuously, and immediately prior to the adoption of the Constitution of 1850, constables served the criminal warrants of justices of the peace, and were the general ministerial officers of those magistrates. Those functions, during all of this long period of time, have ever constituted a part of that office, and have been its peculiar and distinguishing characteristics. It may be very justly said that they are of the original functions of that office, and that if any, others, not these have been added. They have ever been the functions of a constable in Michigan, and at the time of the adoption of the Constitution of 1850, they were known and understood to be a part of that office. The people of this State never knew the office of constable without these prerogatives. They had known this office as it existed at the common law, and as declared by their statutes from the time Michigan became a State, and earlier. They had inherited it. They were satisfied with it. Therefore, in 1850, the office whose existence had theretofore depended upon the legislative will was made *permanent* by the people in the organic law of the State. Constitution of 1850, Art xi. § 1.

Particular expressions used in a Constitution are to be understood as conveying the thoughts which they

represented when introduced,   *Newell v. People* 7 N. Y. 97;
*Gibbons v. Ogden* 9 Wh. 188; Cooley's Const. Lim. 58–61.
As at the common law constables were the local peace
officers, and the functions of being the ministerial officers
of justices of the peace, and of serving criminal warrants,
originally constituted the office of constable (his civil
functions having been since added), and the office, as
then constituted, having been confirmed and made per-
manent by the Constitution, the Legislature cannot deprive
the locality of its constitutional office by transferring the
functions which comprise it to some creature of the cen-
tral government.   *Hubbard v. Springwells* 25 Mich. 153;
*People v. Draper* 15 N. Y. 532; *People v. Raymond* 37 N.
Y. 428; *Warner v. People* 2 Denio 272; *State v. Hastings*
10 Wis. 525; *McCabe v. Mazzuchelli* 13 Wis. 478; *State
v. Brunst* 26 Wis. 412.

*Cornelius J. Reilly* for respondents.

CAMPBELL, J.   Relator, who is a constable of the tenth
ward of the city of Detroit, presented a bill for services,
as such, for allowance by the board of auditors, which
they refused to consider.   It is admitted by their answer
that the bill is correct, if. they have power to audit it.
The services performed were in the arrest of parties
charged to have committed crimes outside of the city
and in Wayne county, partly subject to trial by a jus-
tice and partly beyond his trial powers, and in one case
the respondent was arrested on a charge of bastardy,—
he being in the township of Ecorces.   The arrests were
all made on warrants which were issued by justices
whose offices were held in Detroit, and who belonged
there.   The auditors declined to consider the claim on
the ground that all such warrants should have been
served by the police and not by constables.   This objec-
tion is based on certain provisions of an act entitled
"An act to establish a police government for the city of
Detroit," approved April 17, 1871.   This statute appears
to be a re-enactment, with a few alterations, of a former

act bearing the same title, approved January 24, 1865. It is not apparent, but it is not very important, why the act of 1871 was passed as an original instead of as an amendatory act. Possibly difficulty may have arisen under intermediate legislation amending the city charter in 1869. On the 15th day of April, 1871, a law had been passed to cure any previous irregularity or defect in the powers of the board. 3 Laws of 1871, p. 186. Whatever may have been the fact, the new law is, so far as has been shown to us, the only one involved in the present controversy, and we need not go behind it.

The sections of the Police Act supposed to bear upon the claim of relator are sections 13, 35, 36 and 38. These sections are substantially if not verbally identical with previous amendments adopted in 1867, and counsel, regarding the act of·1871 as only amendatory, have cited these former provisions instead of those of 1871. The statute of 1871 has, however, evidently superseded the older statutes, and is the only law now in force, except as it may have been amended since, directly or by implication.

Section 13, so far as now involved, contains the following provisions: "The members of the police force of the city of Detroit shall possess all the common law and statutory powers of constables, except for the service of civil process; and any warrant for search or arrest, issued by any magistrate of the State of Michigan, may be executed in any part of said State, by any member of said police force, without backing or endorsement from any other magistrate or officer of said State; and for all offenses committed in the county of Wayne, the expenses incurred in serving said warrant shall be certified by the board of police, and audited and paid by said county; and in all other cases such expenses shall be determined by and paid under the direction of the proper auditing board of the county in which the offenses charged in said warrant shall have been committed." * * * * "The members of said police force shall also serve and execute all process and subpœnas issued in the recorder's court and the police court of said city, and all process and subpœnas in criminal cases, issued by justices of the peace in said city."

Section 35. " The members of the Metropolitan police force shall have the exclusive power, and it shall be their duty, to serve all process within the city of Detroit, issuing from the recorder's court, police court, and from justices of the peace in criminal cases, within said city, whether directed to constables, the sheriff, or otherwise, and shall be detailed by the proper officers to attend, instead of deputy sheriffs or constables, all courts of criminal jurisdiction of said city. All the duties now performed by deputy sheriffs in serving writs, executing orders of said court, attending said court, conveying prisoners to and from the county jail for arraignment or trial before said court, and in conveying prisoners to the Detroit House of Correction, the Reform School, county jail, State prison, or other place of punishment and imprisonment, under the judgment, sentence, order, or process of said court, shall be performed by the members of said police force; and in no case shall deputy sheriffs, or any constable of said city, receive or be paid by the county or State any fee or compensation for services directed in this section, or in any part of this act, to be performed by the members of said force. The actual expenses of travel and of performing duties under this section shall be paid by the county of Wayne, upon bills allowed by said board of police and endorsed by the president and secretary thereof."

Section 36 abolished the offices of marshal and deputy marshal and provided that the duties should be performed by the superintendent of police, or by the captains and sergeants under his directions. This section, like some others, is evidently copied from the law of 1865, and refers to matters which had been before abolished.

Section 38 is open to the same criticism and refers to obsolete matters.

The powers given by section 13 are not exclusive, and have, therefore, no bearing on the present issue. Section 35 is exclusive, so far as it applies at all, and we are required to decide whether this section can be applied to the case before us, and whether if so applicable, it is so far valid. It did not, as first passed in 1865, apply to justices except when holding courts.

It was suggested for the respondents that we have already passed upon the validity of this statute in the

case of *People v. Mahaney* 13 Mich. 485. There is nothing
decided by that case which settles or seriously concerns
this controversy. The only question then before the court
was whether the office of city marshal had been lawfully
abolished by the Police Act. It was decided that the
statute was passed in a constitutional manner, so far as
this court could lawfully inquire into the course of leg-
islation, and that the substitution of the police officers for
the marshal was within the general purview of the title;
and that the office could be lawfully abolished. The
court very carefully abstained from passing upon the
validity of other parts of the act. It was distinctly stated
that no decision could properly be made upon the valid-
ity of particular powers and provisions, until some case
should arise calling for a decision. The amendments
of 1867 had not then been adopted.

The city marshal of Detroit, as provided for at that
time, was not an officer named in the Constitution, nor
a necessary officer for any purpose. He had not any
statutory powers which were not concurrent with those
of other known officers. If his office had been abolished,
as it might have been, with no one designated in his
place, no serious confusion could have arisen. Sheriffs
or constables could perform his statutory powers, and the
common council could provide as they pleased for such
powers as he derived from their grant.

It is unfortunate that other portions of the law have
not been sooner brought up for construction. It has
been changed in some important particulars since 1865,
and amendments have been made to the city charter
which cannot fail to create discussion. The provisions
before referred to are more or less dependent on the sec-
tions concerning the organization and government of the
force, which were claimed with much earnestness on the
argument to allow the police board and its officers and
servants to interfere with the powers of the courts, as
well as of the city.

Upon that subject it is for most purposes enough to

say that no court, in the exercise of its functions, can be lawfully subjected to the control or interference of any executive or ministerial authority, or can receive directions for any purpose except from such other courts as are authorized by the Constitution to have "superintending control over inferior courts." `No court has a right to allow any other interference or to submit to it.

And in this same regard it is also very clearly settled by the Constitution that judicial power can only be vested in courts and judicial officers, and that all of the judges and judicial officers, without exception, must be elected directly by the people of the State or of their local districts. This makes it necessary to be cautious in extending other powers when a conflict is likely to be created.

The Constitution has also provided that no one shall be deprived of liberty without due process of law, and has provided that no warrant shall issue except upon oath or affirmation establishing probable cause. It has been settled for centuries, and the doctrine has been recognized here, that except in cases of reasonable belief of treason or felony, or breach of the peace committed in presence of an officer, there is no due process of law without a warrant issued by a court or magistrate upon a proper showing or finding. *Drennan v. People* 10 Mich. 169; *Quinn v. Heisel* 40 Mich. 576; *Sarah Way's Case* 41 Mich. 299.

The question is whether the power of justices in Detroit in criminal matters, and in the enforcement of their process, or the power of constables in that city to serve their criminal process has been taken away by any valid legislation. Both of these matters belong together. And in considering this question we are bound to construe the Police Act in view of its title and its lawful purposes, assuming, so far as we reasonably can, that broad language should be confined to lawful objects, and inferring no unlawful intent, except where too plain to be mistaken.

It is not, and it certainly cannot be claimed, that under

43 MICH.—13.

our Constitution there can be any such thing as a municipal government which is not managed by popular representatives and agencies deriving their authority from the inhabitants. No business which is in its nature municipal can be controlled by State or any other outside authorities. *People v. Hurlbut* 24 Mich. 44; *Hubbard v. Springwells* 25 Mich. 153; *Park Com'rs v. Common Council of Detroit* 28 Mich. 228; *Attorney General v. Common Council of Detroit* 29 Mich. 108; *Attorney General v. Holihan* 29 Mich. 116.

There can be no complete city corporation without means of enforcing such regulations as are necessary for the peace and good order of the community, and this can only be done by the aid of officers. A great majority of the regulations needed to prevent confusion in cities lie entirely outside of criminal law, and authorize interference of an official character where no arrest would be lawful. And in many of these cases it is not uncommon for quarrels to arise which go far enough to create breaches of the peace, when it would be very dangerous if the municipal officer must at that point stop short in the performance of his civil duty and call to his aid a different officer. Until the Police Act of Detroit was passed, there was not a single place in the State where these functions were not united, and the Police Act itself attempts to unite them, not by giving city officers functions under State law, but by giving State officers functions under municipal regulations, and depriving municipal officers of municipal powers. We can hardly believe that when the police system was adopted in 1865 the Legislature had any idea that they were doing more than adding desirable auxiliaries to municipal authority. It is not to be supposed they meant to revolutionize our institutions by superseding local by central authority. The police force is nothing more nor less, so far as it is lawfully constituted, than an additional force of constables and watchmen appointed by the State for certain limited purposes; and unless some power exists in the Legisla-

ture not only to add to the force of local peace officers but to supersede them entirely for all common law purposes, the provisions complained of in this statute cannot be maintained if they are to be construed as respondents construe them.

The purpose of the Police Act expressed in its title furnishes no suggestion which would lead courts or officers to look for any legislation in the body of the act to affect their powers or jurisdiction in any matters not relating to the interests and peace of the city of Detroit. No liberality of construction could allow an inferential or express repeal of the general laws of the State except to that extent. And it is not easy to see how under such a statute courts whose criminal powers are not confined to the city and for most purposes are entirely extra-territorial to it, can be included within its terms merely because they may hold sessions there. The general laws direct how they shall act and what officers shall be their bailiffs. Any such officer must obey their mandate, or stand punishable. A large portion of the police force which respondents correctly or incorrectly claim to be subject entirely to orders from superiors, would by such a rule be subjected to conflicting orders, which would create confusion, because all are not employed in the same duties. This, of itself, might raise serious questions if the police can be made exclusive officers for any of these purposes. It is not clear that the act will bear so extreme a construction even in regard to the municipal courts properly so called. If any court under it is compelled to depend on the discretion of the police authorities for officers to perform its mandates, it would be such a subjection of judicial to ministerial oversight as could not be tolerated. We are, therefore, called on to look with some care into the constitutional provisions and the general legislation had under them, touching the matters now litigated. And it must be borne in mind that the jurisdiction of the local courts, and the functions of local officers, while distinct in many respects, have more or less connection.

The power of justices of the peace to try civil causes is so fixed by the Constitution that they are absolutely necessary magistrates in cities as well as elsewhere. Their power to try criminal offenders is statutory, but it is contemplated by the Constitution that it shall exist to some extent, and the general statutes have extended this jurisdiction to a large class of minor offenses, and it can only be restricted by the special municipal criminal jurisdictions in cities. A municipal court could not be authorized to try extra-municipal crimes, and no attempt has ever been made to permit it. The result is that the general statutes of the State give every justice in Detroit power to dispose of all criminal business within the county of Wayne arising beyond the city. Those same laws make constables competent and compellable to serve their criminal process, as the sheriff is also in some cases. Comp. L. chapter 179.

The power to examine and commit persons charged with crimes beyond the cognizance of justices to try, is also entrusted to justices of the peace in common with various judges, judicial officers, and city officers. Comp. L. ch. 259. This power is not exercised by those officers as courts, and it is not in the proper sense of the term judicial power. It may be vested in other persons than courts, as well as in courts. It belongs to the duties of conservators of the peace; and the Constitution has made supreme and circuit court judges, as well as justices of the peace, such conservators. Art. 6 § 19. The difference between this power and that of trying offenders is referred to, among other cases, in *Daniels v. People* 6 Mich. 381 and *Ex parte Farnham* 8 Mich. 89. This power of preliminary examination was by the Police Court Act of 1850 vested in the police court of Detroit, and that act was continued by the schedule to the Constitution, sec. 11.

But no reference is made in the original Police Court Act or in the first Police Act to the important functions of conservators of the peace in the prevention of crime, which is fully provided for by chapter 258 of the Com-

piled Laws.   It is very remotely referred to if touched
at all by the present act.   This power is not one which
can be taken away by implication, if at all.   It is essen-
tial to the public safety, and the constitutional grant of
this power to various judicial officers,—which was only
limited by section 11 of the schedule,—is imperative.   No
doubt others may be, as they always have been, entrusted
with similar powers.   But no one in whom the Consti-
tution has vested it can be deprived of it.   This power
exists in the city as well as out of it, and in relation
to crimes threatened to be done there or elsewhere.

In view of the peculiar provisions found in various
portions of the act, it is perhaps not a strained construc-
tion to construe it,—so far as crimes committed within
the city are concerned,—as intended to cut off deputy
sheriffs and constables from performing any criminal
services whatever.   But the sheriff himself—(whose duties
under the laws of the State are all,—unless with some
possible slight exceptions,—as well performed by deputy
as in person) is not covered by all of these sweeping
provisions; and inasmuch as all of the courts of record
sit in Detroit, he would be substantially deprived of his
office in its most important functions if he had been,
and if the act covered any but city crimes.   For the
purposes of the present controversy it is necessary, in
order to avoid attributing to the Legislature an intention
very far beyond the title of the act, to hold that the
section which gives exclusive power to the police force
for the service of process "in criminal cases within said
city" does not refer to any cases where the crime was
committed out of the city.   But we do not mean to be
understood as recognizing the legality of any such exclu-
sive power any where, under the laws of the State and
the Constitution.   The shape the controversy has taken
and the differing characters of the relator's claims render
der it necessary to refer to rules which may apply some-
what further.

Counsel on the argument very properly and very ably
placed the right to redress chiefly on the ground that

the rights and duties of constables were for many purposes recognized and fixed by our constitutional polity, and so connected with the course of criminal justice as to be beyond legislative annihilation.  The argument, although dealing with very ancient affairs, in no sense belongs to mere antiquarian curiosity.  It is very unfortunate and very discreditable that so little heed is sometimes paid to the continued and perpetual importance of institutions which form an essential element in the organic life of our government.  Courts, at least, are bound to respect what the people have seen fit to preserve by constitutional enactment, until the people are unwise enough to undo their own work.  The loss of interest in the preservation of ancient rights is not a very encouraging sign of public spirit or good sense.

The municipal corporations of this State,—as we have had frequent occasion to declare, are all organized, and constitutionally required to be organized, in such a way as to preserve to the inhabitants full means of local self-government.  There has never been a time when the city of Detroit has not had in common with townships the right to choose its own constables.  When the city was not divided into wards, they were chosen at large.  When so divided, each ward was given the choice of its own constable, as well as of other ward officers.  For election purposes, each ward is made by the Constitution equivalent to a township.  Art. 7 sec. 1.  The Constitution, in terms, requires each township to elect constables. Art. 11 sec. 1.  It required the Legislature to provide for cities and villages (Art. 15 sec. 13); and it continued in force all existing corporations.  Schedule, sec. 2.  No municipal corporation had ever existed here or in England, without constables or officers answering to constables. Under the charter of Detroit there are no other officers chosen by the people or by the corporation, having powers at all analogous.

It cannot be maintained that legislation would be valid which retained the names but destroyed the powers of such officers.  While there is an undoubted power

to vary the duties of such officers, it cannot be lawful
to so change those duties as to practically change the
office.    When offices are named in a Constitution they
are named as having a known legal character.

The general laws of the State have made constables
in all important particulars what they were at common
law, when our American systems were framed.    They are
here, and always have been, the local peace officers of
their vicinage, the ministerial officers of justices of the
peace, and the bailiffs of courts of record of criminal
jurisdiction in the county.

The only powers they have ever possessed as process-
servers for civil purposes have been given to them not
as a change in their own offices, but as the result of a
change in the official powers of justices.    It is simply
because they are the ministerial officers of justices that
civil process was issued to them as a result of civil pow-
ers conferred on justices.    Those civil powers have no
concern whatever with the municipal interests.

It would serve no useful purpose to enter into any of
the doubtful questions concerning the origin and mean-
ing of the term *constable*.    His powers and duties are
among the best known subjects of legal inquiry.    From
the high constable of the realm to the ordinary consta-
ble, the different ranks were all, within their several
spheres, guardians of the public safety, and conservators
and defenders of the public peace, with power to summon
to their aid any persons whom they found it necessary to
call.    The ordinary constable is the most ancient peace
officer known, and was by various names, but with sub-
stantially identical powers, the legal head of his com-
munity for the purpose of enforcing the peace.    Until
conservators of the peace were appointed, he had during
much of the time nearly all of the authority afterwards
conferred on them.    The watchmen and other persons
from time to time provided for by statute, and now
represented by the police, were usually legally subordi-
nate and to some extent under his direction.    Most
arrests were made by him or under his supervision.    The

office was an onerous one, and in process of time became more troublesome than pleasant, and met with the treatment which all offices meet which deal with the handling of rogues and vagabonds, but it has never ceased to be important and responsible. And it is remarkable as the one office which, in all the mutations of prerogative, has continued since the times long prior to the Conquest an office filled by popular choice for the preservation of the peace in the territory of its constituents. See 1 Backus on Sheriffs, Coroners and Constables, 38 *et seq.*; Finch's Law, chap. 22, fol. 127; Comyn's Dig. "Leet" M. 6–12; 2 Hale P. C. ch. 10, 11, 12; Tomlin's Law Dic. "Constable;" *King v. Routledge* Doug. 531.

The researches of the counsel for relator have brought forward many interesting references which it is not necessary for us to dwell upon, as they generally tend to the same result.

It will appear from these and many other authorities, that the one class of duties belonging to the office of constable which never changed, is the performance of the functions of a peace officer in the arrest of criminals and the prevention of crimes and disturbances. Other duties have become obsolete, and still others have been granted and changed.

It is as a peace officer that he has been known to our laws from the beginning, and it is as such that our General Statutes chiefly refer to him. As before suggested, he is required to be chosen in Detroit, and he is the only peace officer who is chosen by the corporation or the people of Detroit. We think the Constitution used the name as having a known meaning, and that while the police may be auxiliary they cannot supersede him in his functions; and that his service of process in the cases brought to our notice is authorized and to be compensated under the criminal laws of the State.

The mandamus must issue as prayed, but without costs.

The other Justices concurred.