DETROIT CITIZENS' ST. RY. CO. et al. v. CITY OF DETROIT.

CITY OF DETROIT v. DETROIT CITY RY. et al.

(Circuit Court of Appeals, Sixth Circuit. October 2, 1894.)

No. 200.

1. STREET RAILROADS—POWER TO TAKE EASEMENT IN STREETS FOR TERM BEYOND CORPORATE EXISTENCE.
   A street-railway company is not incapable of taking a grant of a right to use streets of a city for its railway for a term extending beyond its own corporate franchise, the interest granted being assignable.

2. SAME—DURATION OF RIGHT TO USE STREETS.
   The duration of such a right depends on the language of the grant and the extent of the interest which the grantor had authority to grant.

3. MUNICIPAL CORPORATIONS—POWER TO GRANT USE OF STREETS FOR STREET RAILWAYS.
   The use of city streets for street-railway purposes being, under the law of Michigan, a legitimate use, the general powers vested in the city of Detroit by its charter to open, close, and widen streets, and to prescribe, control, and regulate the manner in which the streets shall be used and enjoyed, are broad enough to permit the city to consent to the use of its streets for such purposes by any company having the requisite franchises of a street-railway company.

4. SAME.
   Query, whether such general powers authorize consent to such use, either in perpetuity or for a definite term.

5. SAME—CONSTRUCTION OF CORPORATE POWERS.
   The rule which requires strict construction of the powers of municipal corporations is not to be applied so as to defeat the legislative intent.

6. SAME—CONSENT OF CITY TO USE OF STREETS FOR STREET RAILWAYS — LIMITATION OF TERM.
   Laws Mich. 1861, p. 11, added, to the general tram-railway act of 1855, sections 33 and 34, which authorized the organization of companies to construct and operate street railways, with a proviso that no such com-

pany should be authorized to construct a railway through the streets of a city without the consent of the municipal authorities, and under such regulations and upon such terms and conditions as they might from time to time prescribe; and Laws 1867, p. 257, added a further proviso that, after such consent should have been given and accepted, such authorities should make no regulations or conditions whereby the rights or franchises so granted should be destroyed or unreasonably impaired, or such company be deprived of the right of constructing, maintaining, and operating such railway. *Held*, that under these provisions, when construed together and with regard to the peculiar constitutional policy of the state limiting the legislative power in respect of direct interference with purely local concerns of cities, the general charter powers of the city of Detroit over its streets, the general purpose the legislature had in view, and other sections of the same acts which provided for acquiring rights of way and for mortgaging street railways, including their rights of way, every such mortgage to be deemed a mortgage upon real estate, the power of the city of Detroit to give the "consent" required was not a power merely implied, and therefore to be strictly construed, but was directly conferred, and authorized a grant of such easement of way in the streets as was requisite for the purposes to be accomplished; and as such power was conferred without express words of limitation, and the "terms and conditions" on which the grant was to be made were left to the discretion of the local government, the term of such a grant was not necessarily limited by the duration of the franchises of the grantee. 56 Fed. 867, and 60 Fed. 161, reversed.

**7. SAME.**

The power of the city to make such a grant of a right of way extending for 16 years beyond the corporate life of the grantee was not limited by any necessary implication from the policy of the state as shown by Const. Mich. art. 15, § 10, which provides that no corporation, except for municipal purposes or for construction of railroads, plank roads, and canals, shall be created for a longer period than 30 years; or from the limitation to the same period imposed by the legislature upon the life of street-railway companies; or from apprehension of possible evils from long grants of such street privileges. 56 Fed. 867, and 60 Fed. 161, reversed.

Appeals from the Circuit Court of the United States for the Eastern District of Michigan.

This was a bill filed in the circuit court of Wayne county, Mich., by the City of Detroit, against the Detroit City Railway, the Detroit Citizens' Street-Railway Company, Sidney D. Miller and William K. Muir, trustees, and the Washington Trust Company of the City of New York, for an injunction to compel the removal of tracks from the streets, and to restrain the further operation of a street railway therein. The cause was removed to the federal court by the Washington Trust Company of the City of New York, and a motion to remand was afterwards denied. 54 Fed. 1. A motion by complainant to postpone the hearing on bill and answer, or, in the alternative, to dismiss the bill, was also denied. 55 Fed. 569. At the hearing upon the bill and answer, the injunction was refused as to the lines of the Congress & Baker Street-Railway Company and the Cass Avenue Street-Railway Company, and further argument ordered as to the remaining lines, with leave to the parties to amend their pleadings. 56 Fed. 867. The cause was heard upon the argument and amended pleadings, and a decree was rendered in favor of the complainant, excepting as to the lines named above, with costs to the defendants. 60 Fed. 161. An appeal was taken to the supreme court by the Detroit City Railway and Charles

M. Swift, who had been made trustee in the place of William K. Muir, deceased, but the appeal was dismissed for want of jurisdiction, no opinion being delivered. 154 U. S. 500, 14 Sup. St. 1145. The remaining defendants and the complainant separately appealed to the circuit court of appeals.

James C. Carter, for appealing railway companies.

Ashley Pond and Otto Kirchner, for Detroit Citizens' St. Ry. Co.

Sidney T. Miller, for first mortgage bondholders.

John C. Donelly (Fred A. Baker and Henry M. Duffield, of counsel), for Washington Trust Co.

Charles A. Kent and Benton Hanchett, for City of Detroit.

Before JACKSON, Circuit Justice, LURTON, Circuit Judge, and SAGE, District Judge.

LURTON, Circuit Judge. The relief which the bill seeks is the removal from the streets of Detroit of the tracks and cars of the Detroit Citizens' Street-Railway Company. The ground upon which the relief is sought is that the term for which the city consented to the use of the streets occupied by that company has expired by limitation, and that that company is therefore an unlawful trespasser on the streets, and its tracks and cars a public nuisance. The Detroit Citizens' Street-Railway Company is the assignee and successor of the Detroit City Railway Company. The street easements or privileges now involved were derived from the Detroit City Railway Company, and the controversy depends upon the duration of the term acquired by that company from the city.

In November, 1862, the city council of Detroit, by ordinance, consented to the use of certain designated streets for a term of 30 years, by Cornelius S. Buchnell and his associates and their successors and assigns, when they should become incorporated as a street-railway company under the general law of Michigan providing for the incorporation of street-railway companies. Though that easement was to Buchnell and associates, yet it was given in anticipation that they would become incorporated, and thereby acquire the franchises essential to the operation of a street railway for tolls; and the grant was so framed as to inure to them in their corporate capacity. Subsequently, they did comply with the requirements of the law of the state, and became incorporated under the name of the Detroit Street-Railway Company, with a corporate life limited to 30 years. The date of this incorporation was May ——, 1863. This consent ordinance contained numerous provisions concerning the streets to be occupied, the kind of structure to be put down, the mode in which the cars should be operated and track maintained, the amount and kind of license tax to be paid the city, etc.

Immediately upon incorporation, the company proceeded to construct and operate the contemplated road. Frequent ordinances recognizing the original consent, and enforcing the terms and conditions upon which it was made, leave no doubt but that consent has inured to the Detroit City Railway Company. In course of time the relations between that company and the city council became

complicated and unsatisfactory. A new adjustment of the terms and conditions upon which the consent had been given was regarded as a necessity. The ordinance of 1862 was therefore, in November, 1879, amended in numerous particulars. New burdens and obligations were imposed upon the company, additional taxes were provided for, some reduction in tolls was required, and certain extensions deemed desirable by the public were demanded. Under the statute providing for obtaining the consent of cities and villages to the construction and operation of street-car lines on or in the streets of such cities and villages, it was provided that after such consent had been granted it should not be revoked or altered without the consent of each party to the contract. The inducement operating upon the railway company to give its assent to the very serious burdens imposed by the change proposed in the terms and conditions upon which the city had consented to its occupancy of the streets was found in a provision of the new ordinance, by which the term for which the city consented to the use of its streets for street-railway purposes was extended for 30 years from the date of the new arrangement. The original consent would have expired in May, 1893, being for 30 years. The extension of the rights and privileges originally conferred would operate to extend the term until November, 1909. This extension of the term seems to have been the sole consideration for the assumption by the company of the new burdens imposed by the new proposal. It was regarded as a sufficient consideration, and was accepted in writing as required by law, and became a binding and irrevocable agreement, unless the contract was void as being in excess of the corporate powers of the contracting parties.

The act under which the Detroit City Railway Company became incorporated contained a provision limiting the corporate life of all companies organized thereunder to a term of 30 years from date of organization. Thus, the grant of an extension of the term was to a company whose corporate life would expire 16 years before its street rights and privileges. This fact has given rise to this litigation, and the question to be decided turns upon the significance to be attached to the grant of a 30-year street easement to a corporation having only 14 years of corporate life. That the corporate life of the Detroit City Railway Company would expire 16 years before the expiration of the extended term of street rights was a fact well known both to the city authorities and the railway company. Upon the expiration of the corporate life of the corporation, its corporate franchises to operate for tolls a line of street railway would likewise expire. The grantee in the extension ordinance could not, therefore, effectively enjoy the rights and privileges conferred beyond the period of its corporate existence. This, we must assume, was well known to both of the contracting parties. What, then, was the consideration moving the corporation to accept the new burdens and obligations to obtain a grant it could not personally enjoy beyond the duration of its corporate life? The answer is obvious. The original consent was not limited to Bushnell and his associates, nor to the corporation which they were pro-

moting, and to which the consent was to inure. That consent was to the grantees named and described, and their "successors or assigns." The ordinance of 1879 was not a new grant or a new consent; it was confessedly an extension of the old grant of consent, upon the terms and conditions of the old consent, except in so far as those terms were readjusted. It follows that the extension of that term was a grant to the Detroit City Railway Company and its successors and assigns. While, therefore, neither party supposed that it was in the power of the city council to extend the corporate life or corporate franchises of the Detroit City Railway Company beyond the term prescribed in the law which gave it birth, yet it was supposed and believed by each that the value of the extended term would consist in its assignability to a grantee endowed with the franchises essential to the enjoyment of the city's consent to the use of its streets for street-railway purposes. These considerations operated to induce the acceptance of the new terms imposed, and reliance upon the soundness of the opinions then entertained has led to the investment by the company in important extensions and costly improvements, aggregating in amount upward of a million of dollars. In reliance upon the property value of the extended term, the property, franchises, and property rights of the company were mortgaged by the Detroit City Railway Company to the defendants Sidney D. Miller and W. K. Muir as trustees to secure an issue of $1,000,000 of bonds, all of which are now outstanding in the hands of purchasers who have relied upon the validity of the extension ordinance. In January, 1891, that company sold and assigned its railway, franchises, rights of way, and property rights of every kind to the Detroit Street-Railway Company, a corporation of the state of Michigan. In October, 1891, the Detroit Street-Railway Company sold and transferred all its railway and franchises and easements of every kind to the defendant the Detroit Citizens' Street-Railway Company. The latter was a corporation lately organized under the general incorporation law of Michigan, and having all the powers and franchises necessary to the operation of a street railway. Each of these sales and assignments was in pursuance of express statutory authority, and neither transaction is in any way questioned. After the Citizens' Street-Railway Company had acquired the road and property of its predecessors, it executed a mortgage to the defendant the Washington Trust Company to secure an issue of $3,000,000 of bonds, of which $2,000,-000 are outstanding in the hands of holders induced to buy in reliance upon the extension of the term made in 1879. To grant the relief sought will entirely extinguish rights and privileges in the streets which the complainant avers can now be disposed of for upward of a million of dollars. It is equally plain that the value of the tangible property owned by the railroad company and conveyed in its mortgages, such as its tracks and equipment, will be enormously reduced if removed from the streets. That the extension was made and accepted in good faith is not questioned. That the street-car companies have not faithfully complied with all the terms and conditions imposed by the adjustment made in

1879 is not averred in any pleadings. The only theory upon which the bill was filed is that the opinion entertained at the time of the extension as to the power of the city council to extend the term of the street rights of the street-railway company beyond the duration of its corporate life was erroneous, and that the contract was void as being ultra vires.

The circuit court concurred in opinion with the counsel for complainant, and granted a decree for the removal of the tracks and cars from the streets as being in law a public nuisance. A review of that decree presents propositions very grave in character, both by reason of the magnitude of the private interests concerned, and in that their determination will affect public interests involved in the supposed limitations upon the powers of the municipalities of Michigan.

The views entertained by the circuit judge, and which led him to the conclusion now to be reviewed, are expressed in an opinion reported in 55 Fed. 569. That opinion may be thus summarized:

(1) That the power to make the grant relied on by defendants in this case must be found in the train or street-railway acts, or not at all.

(2) That the power conferred by those acts to grant an easement in the streets to a street-railway company is not an express, but an implied, power.

(3) That "a power implied must be limited to the necessity which gives rise to its implication."

(4) That "an inevitable limitation thus arising is that the easement shall not endure beyond the life of the franchise for which the easement is given."

(5) That the corporate life and corporate franchises originated under a general law which limited their continuance to a period of 30 years.

(6) That it therefore followed that the power of the city was limited to the grant of an easement of way in the public streets not exceeding in duration the corporate life of the company receiving the grant.

The very eminent counsel for the city have, in addition to the points of decision stated, argued very strenuously that, irrespective of the capacity of the city to make the grant in question, it was not within the corporate power of the Detroit City Railway Company to receive a street franchise for a term extending beyond its corporate franchise. We cannot at all agree to this proposition. The duration of any estate which such a corporation may take must depend upon the language of the grant and the power of the grantor to make it.

"It was an incident at common law to every corporation to have a capacity to purchase and alien lands and chattels, unless they were especially restrained by their charter or statute." 2 Kent, Comm., side pages 281, 282.

The same author says:

"Corporations have a fee simple for the purpose of alienation, but they have only a determinable fee for the purposes of enjoyment. On the dissolution of the corporation, the reverter is to the original grantor or his heirs; but

the grantor will be excluded by the alienation in fee, and in that way the corporation may defeat the possibility of a reverter."

"If real or personal property or negotiable contracts are conveyed to a corporation, subject to no condition, the company has the right to transfer the same absolutely, and in such case the title of the purchaser will not be affected by a subsequent dissolution of the corporation." Mor. Priv. Corp. §§ 330, 1031; Nicoll v. Railroad Co., 12 N. Y. 121; State v. Rives, 5 Ired. 305–309; People v. O'Brien, 111 N. Y. 13, 18 N. E. 692; Omaha Bridge Cases, 10 U. S. App. 192, 2 C. C. A. 174, 51 Fed. 309.

The case last cited was where a lease of trackage and bridge rights was made to a railroad company for 999 years, which had only a corporate life of 40 years.

In People v. O'Brien, cited above, the instance was that of a grant of an easement in the streets of New York, unlimited as to time. The grant of street rights had been made by the city of New York in perpetuity to a street-railway company having a corporate life limited to 1,000 years, but subject to a reserved right of amendment, alteration, or repeal. The grant was made by authority conferred by an amendment to the constitution of the state adopted in 1875, which prohibited the enactment of any law which should authorize "the construction or operation of a street railway except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of that portion of that street or highway upon which it is proposed to construct or operate such road be first obtained." Const. N. Y. art. 3, § 18. The court of appeals of New York, in a most elaborate opinion, held:

(1) That the "consents" obtained "were the muniments of title to the enjoyment of the rights acquired thereunder by the railroad company," and constituted a property interest which was not destroyed by the repeal of the charter.

(2) That there was no limitation upon either the power of the city to grant an easement in perpetuity extending beyond the prescribed life of the corporation, nor did such limitation operate to limit the power of the corporation to receive such grant. The court said, as to the duration of such a grant, that:

"This is to be determined by a consideration of the language of the grant and the extent of the interest which the grantor had authority to convey. We think this question has been decided by cases in this court, which are binding upon us as authority in favor of the perpetuity of such estates. That a corporation, although created for a limited period, may acquire title in fee to lands or property necessary for its use, was decided in Nicoll v. Railroad Co., 12 N. Y. 121, where it was held that a railroad corporation, although created for a limited period only, might acquire such title, and that, where no limitation or restriction upon the right conveyed was contained in the grant, the grantee took all of the estate possessed by the grantor. The title to streets in New York is vested in the city in trust for the people of the state, but under the constitution and statutes it had authority to convey such title as was necessary for the purposes of corporations desiring to acquire the same for use as a street railroad. The city had authority to limit the estate granted, either as to the extent of its use or the time of its enjoyment, and also had power to grant an interest in its streets for a public use in perpetuity, which should be irrevocable. Yates v. Van de Bogert, 56 N. Y. 526; In re New York Cable Ry. Co., 109 N. Y. 32, 15 N. E. 882. Grants similar in all material respects to the one in question have before been before the courts of this state

for construction; and it has been quite uniformly held that they vest the grantee with an interest in the street in perpetuity for the purposes of a street railroad. People v. Sturtevant, 9 N. Y. 263; Davis v. Mayor, etc., 14 N. Y. 506; Milhau v. Sharp, 27 N. Y. 611; Mayor, etc., v. Second Ave. R. Co., 32 N. Y. 261; Railroad Co. v. Kerr, 72 N. Y. 330. Other cases are also reported in the books, but it is deemed unnecessary to accumulate authorities on this point."

We are clearly of opinion that the power of the Detroit City Railway Company was not restricted to the taking of such a grant for a term limited by its corporate life.

The fact that it could not personally enjoy the interest thus granted after the expiration of its substantial and corporate franchises would not cut down the estate granted. Its power of alienation was unaffected, and its assignee, if otherwise endowed with the franchises essential to the operation of street railways, might enjoy the rights and privileges derived by assignment. The duration, character, and extent of an estate conveyed to a corporation must be determined by the terms of the grant unless there be an express prohibition in its organic law, or one imposed by statute. Ang. & A. Corp. § 195; State v. Rives, 5 Ired. 305–309; Asheville Division No. 15 v. Aston, 92 N. C. 579; State v. Gas-Light Co., 102 Mo. 472, 14 S. W. 974, and 15 S. W. 383; Gere v. Railroad Co., 19 Abb. N. C. 193, 203, and cases cited above. There is nothing in the nature of the property rights involved in a grant of an easement in the streets for street-railway uses which distinguishes it from other property acquired by a corporation in the exercise of its franchises; but it by no means follows that, because the street-railway company had the capacity to take an easement in the street for a term extending beyond its corporate franchises, the city had the power to make such a grant.

The power of the city in such matters is not to be determined solely by the power of the grantee to receive the interest attempted to be conveyed. It is just as essential that the city shall have the power to make the grant as that the grantee shall have the capacity to take the estate granted. In its last analysis the soundness or erroneousness of the conclusion reached by the circuit court must turn upon a consideration of the powers possessed by the city in respect to the use of the streets for street-railway purposes. That public streets are a public trust, to be held and preserved for legitimate street uses, is an obvious truth. That the ordinary power to control the public streets usually conferred upon all municipal governments will not justify a diversion to other uses, nor support a delegation of the power of control to others, or any abridgment of the legislative authority of the city over the streets, is well-settled law. In view of these general principles, what were the powers possessed by the city of Detroit touching the use of its streets for street-railway purposes?

1. By repeated decisions of the Michigan courts it has been adjudged that a street railway, whether the motive power be horse or electricity, is but an improved mode of street use, and is not, therefore, an additional servitude which abutting owners may restrain. Railroad Co. v. Heisel, 38 Mich. 62; In re Grand Rapids St. Rys., 48

Mich. 433, 12 N. W. 643; Maybury v. Gaslight Co., 38 Mich. 154; People v. Railway Co., 92 Mich. 522, 52 N. W. 1010; Dean v. Railway Co. (Mich.) 53 N. W. 396. ·

2. If the use of the streets for street-railway purposes is a legitimate use, then it must follow that the general powers vested in the city by its charter "to open, close, and widen streets," and "to prescribe, control, and regulate the manner in which the highways, streets, avenues," etc., "shall be used and enjoyed," is a power broad enough to permit the city to consent to the use of its streets for such purposes by any company having the requisite franchises of a street-railway company. Judge Dillon, in his work on Municipal Corporations (section 575), in summing up his conclusions with respect to the general charter powers of municipalities over their streets as affecting the power to grant permission for such use of the streets by street railways, says:

"The ordinary powers of municipal corporations are usually ample enough, in the absence of express legislation on the subject, to authorize them to permit or refuse the use of streets within their limits for such purposes."

Upon a full consideration of the subject, the supreme court of Kansas, in the case of Atchison St. Ry. Co. v. Missouri Pac. Ry. Co., 31 Kan. 661, 3 Pac. 284 (the opinion being by Judge Brewer, now an associate justice of the United States supreme court), came to the same conclusion. Bearing upon the same question are the cases of Brown v. Duplessis, 14 La. Ann. 842; State v. Corrigan Con. St. Ry. Co., 85 Mo. 274; Davis v. Mayor, etc., 14 N. Y. 506 (opinion of Comstock, J., as to the sufficiency of the general powers to support a revocable license); Elliott, Roads & S. 563; Booth, St. Ry. Law, § 15. That a revocable license would be within the general charter powers of the city is distinctly supported by the opinion of Judge Taft, now under review.

3. Whether such general powers will authorize a consent in perpetuity or for a definite term is doubtful. The weight of authority seems to be that any grant of an easement for a definite time operates as an abridgment of the legislative power of control over the streets, and would not be an exercise of the legislative powers conferred by the charter. This view is strongly supported by the New York authorities, as well as many others. Davis v. Mayor, etc., 14 N. Y. 506; Milhau v. Sharp, 27 N. Y. 611; Mayor, etc., v. Second Ave. R. Co., 32 N. Y. 272. These cases seem to proceed upon the theory that the grant of any easement in the streets is the conveyance of a property interest commensurate with the purpose for which it is to be used, and therefore irrevocable, unless that power is reserved. In Mayor, etc., v. Second Av. R. Co., cited above, the court drew a very sharp distinction between the legislative and contractual powers, saying that:

"The rights to create and establish ferries and railroad franchises, are quite distinct and separate from their duties as legislatures, having authority to pass ordinances for the control and government of persons and interests within the city limits. The latter are powers held in trust, as all legislative powers are, to be used and exercised for the benefit and welfare of the whole community, while the former are property, in the ordinary sense, to be acquired and conveyed in the same manner as natural persons acquire and

transfer property, and subject to the operation of such ordinances and by-laws as may be lawfully passed." 32 N. Y. 271.

It is to be also observed that the early decisions of that state did not recognize a street railway as an ordinary street use, but a new burden upon the fee. The cases are reviewed in Fobes v. Railroad Co., 121 N. Y. 505, 24 N. E. 919. Other cases holding that the general power of controlling the streets will not support a consent to their use in perpetuity or for a term of years are Railway Co. v. Mayor, etc., 4 Cold. 406; Louisville City Ry. Co. v. Louisville, 8 Bush, 415; Eichels v. Railway Co., 78 Ind. 261; State v. Trenton, 36 N. J. Law, 79; Nash v. Lowry, 37 Minn. 263, 33 N. W. 787; Lake Roland El. R. Co. v. Mayor, etc., of Baltimore (Md.) 26 Atl. 510. The contrary view is supported in Brown v. Duplessis, 14 La. Ann. 842, and State v. Railway Co., 85 Mo. 274. The question is an open one in Michigan. In view of the strong constitutional policy of that state in favor of local control of matters purely local, to be hereafter more fully referred to, it is not impossible that the courts of Michigan, if the occasion shall arise, will refuse to follow the New York cases, in view of the widely differing policies of the two states in the matter of legislative control over purely municipal interests.

We do not think it necessary to decide this question, inasmuch as the case must turn upon a consideration of other legislation more definitely bearing upon the power of the city to grant a vested easement.

In the interpretation of the legislation hereafter to be considered, we shall make further reference to these charter powers; but we shall, for the purposes of this case, assume that further power was necessary to support a permission to use the streets granted for a term of years.

4. This was the state of the law when the Michigan legislature, in 1861, made provision for the incorporation of street-railway companies.

The constitution of the state does not permit the organization of private corporations under special acts, but requires the enactment of general laws under which the requisite number of persons may become incorporated with the powers prescribed in the general law. In obedience to this requirement there was enacted, in 1855, a general law providing for the organization of train (or tram) railway companies. Those corporations were peculiar, in that it was contemplated that the railway constructed should be subject to use by any owner of cars adapted for use on such road. The compensation of the owners of the road was to consist in tolls taken at toll gates placed at intervals along the line. This train-railway act was amended in 1861, so as to provide for the organization of street-railway companies. This amendment may be found at sections 3526 and 3527, How. Ann. St. Mich.

In 1867 the act was further amended, which latter amendment appears as a proviso to section 3527. These sections are as follows:

"3526. Added 1861, p. 11, Feb. 2, Act 14. Sec. 33. It shall be competent for parties to organize companies under this act to construct and operate railways in and through the streets of any town or city in this state."

"3527. Added, Ib., Am. 1867, p. 257, Mar. 27, Act 188. Sec. 34. All companies or corporations formed for such purposes shall have the exclusive right to use and operate any street railways constructed, owned, or held by them: provided that no such company or corporation shall be authorized to construct a railway under this act through the streets of any town or city without the consent of the municipal authorities of such town or city, and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe: provided, further, that after such consent shall have been given and accepted by the company or corporation to which the same is granted, such authorities shall make no' regulations or conditions whereby the rights or franchises so granted shall be destroyed or unreasonably impaired, or such company or corporation be deprived of the right of constructing, maintaining and operating such railway in the streets in such consent or grant named, pursuant to the terms thereof."

By another act passed in 1863, the act was further amended, being section 3528, and is as follows:

"3528. Added 1863, p. 33, Feb. 18, Act 33. Sec. 35. It shall be lawful for any corporation or association organized under the act hereby amended, for the purpose of building and operating street railways, to borrow money for the purpose of constructing and operating the road or roads proposed to be constructed by them, and for that purpose to mortgage or create any other lien on their franchise, road, superstructure, fixtures, rolling stock and equipments; and whenever such corporation or association shall have acquired a simple easement or right of way for its proposed road, or any part thereof, and shall have made and filed its articles of association in conformity to the provisions of the act hereby amended, any mortgage or mortgages executed by such corporation or association upon the route or routes where such easement or right of way has been obtained as aforesaid, shall be a legal and valid lien upon the right of way so obtained, to the entire extent of the interest of such corporation or association therein, and upon the superstructure and fixtures upon such route or routes, whether the same shall be built before or after or partly before or partly after such mortgaging, and any such mortgage shall be deemed to be a mortgage upon real estate."

In 1867 a separate act was passed, providing for the organization of street-railway companies. That act did not substantially change the manner of organization or powers of such companies, nor the mode in which street rights might be acquired. How. Ann. St. §§ 3526, 3527. Section 3548 reads as follows:

"3548, Sec. 13. Any street railway corporation organized under the provisions of this act, may, with the consent of the corporate authorities, of any city or village, given in or by an ordinance or ordinances duly enacted for that purpose, and under such rules, regulations and conditions as in and by such ordinance or ordinances shall be prescribed, construct, use, maintain and own a street railway for the transportation of passengers, in and upon the lines of such streets and ways, in said city or village, as shall be designated or granted from time to time for that purpose, in the ordinance or ordinances granting such consent; but no such railway company shall construct any railway in the streets of any city or village until the company shall have accepted in writing the terms and conditions upon which they are permitted to use said streets; and any such company may extend, construct, use and maintain their road, in and along the streets or highways of any township, adjacent to said city or village, upon such terms and conditions as may be agreed upon by the company and the township board of the township, which agreement and the acceptance by the company of the terms thereof, shall be recorded by the township clerk, in the records of his township."

Section 3549 provided that, after rights and privileges had been granted to any street railway, such grant should not be revoked.

Section 3550 confers power upon any street railway to purchase

and acquire, at judicial or private sale, any street railway "owned by any other corporation or company, together with all the real and personal estate belonging thereto, and the rights, privileges and franchises thereof, and may use, maintain and complete such road, and may use and enjoy the rights, privileges and franchises of such company, the same and upon the same terms as the company whose road and franchises were so acquired could have done." It also gives to such companies power "to sell, lease, dispose of, pledge or mortgage" "their railway, fixtures, property, and appurtenances, rights, privileges and franchises."

By section 3564, all the "powers, rights, protection and privileges" conferred by the act were extended to all companies theretofore organized in that state.

These two acts were both in full force and effect at the date of the extension ordinance of 1879, and are the acts which the circuit court construed as conferring only an implied power to grant an easement of way.

5. That the street-railway acts cited heretofore do confer the power to grant an easement is conceded by the learned counsel for the city. That this power is not expressly limited as to the term for which such a grant may be made is also conceded. Their contention is that the power under which any easement may be granted is not an express power, but implied only from the power granted to "consent to the operation" of the charter franchises; that a power arising only from this power "to consent" is necessarily limited by the duration of the franchises consented to. This conclusion seems to rest the case upon the assumption that the power of the city to grant any easement is found alone in the train-railway act, and to exclude from consideration, in construing that act, the peculiar constitutional policy of the state limiting the legislative power in the matter of direct interference with the purely local concerns of the cities and chartered villages of the state. It also excludes from consideration the general charter powers of the city of Detroit over its streets; it fails to read, in connection with the train-railway act, the more elaborate street-railway act passed in 1867, and in full force and effect when the extension ordinance was passed, and attaches little importance to the general purpose the legislature had in view when it undertook to provide for the establishment of street-railway companies. Any conclusion drawn alone from an artificial construction of the train-railway act, and which ignores in so large a degree the primary canon of construction which requires that effect shall be given to the intent of the lawmaking power, and that that intent shall be ascertained in every legitimate way, must bring about an unsatisfactory result.

We entirely agree with the rule which requires a strict construction of the powers of municipal corporations, "and that such corporations can exercise only those powers which are either granted by express words, or those necessarily or fairly implied in or incident to the powers expressly granted, or those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable." 1 Dill. Mun. Corp. § 55.

But the books abound in rules of construction. They all have one end in view, and that is to ascertain and declare the intent of the act under construction. Contrasting the rule which requires a strict construction of penal statutes with the rule requiring that the intent of the legislature shall govern, Chief Justice Marshall, in U. S. v. Wiltberger, 5 Wheat. 95, as to the rule of intent, said:

"It is a modification of the ancient maxim, and amounts to this: that, though penal statutes are to be strictly construed, they are not to be construed so as to defeat the obvious intention of the legislature."

In U. S. v. Hartwell, 6 Wall. 395, the court, in speaking of this rule of strict construction of certain classes of statutes, said of the rule that:

"Whenever invoked, it comes attended with qualifications and other rules no less important. It is by the light which each contributes that the judgment of the court is to be made up. The object in construing penal as well as other statutes is to ascertain the legislative intent. That constitutes the law. If the language be clear, it is conclusive. There can be no construction where there is nothing to construe. The words must be narrowed to the exclusion of what the legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject. It must not be defeated by a forced and overstrict construction. The rule does not exclude the application of common sense to the terms made use of in the act in order to avoid an absurdity which the legislature ought not to be presumed to have intended. When the words are general, and include various classes of persons, there is no authority which would justify a court in restricting them to one class, and excluding others, where the purpose of the statute is alike applicable to all. The proper course in all cases is to adopt that sense of the words which best harmonizes with the context, and promotes in the fullest manner the policy and objects of the legislature. The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular, instead of the narrow technical, one; but the words should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent."

Guided by these modifications of the strict construction rule, we will now proceed to test the soundness of the conclusion reached in regard to the construction of the train-railway act.

We must begin with the observation that it is an error to assume that under either of the street-railway acts the operativeness of any of the franchises conferred upon street-railway companies is made dependent upon the consent of municipalities. The power to consent is not a power of consent to the operation or vitality of the charter franchises. The consent which the city is to give is a consent to the construction of any such road in its streets. In support of the contention that municipal consent is essential to the full vitality of the charter franchises, much importance has been attached to the fact that the requirement of such consent is found in the train-railway act in the form of a proviso to section 34, and therefore to be construed as a limitation upon the granting section No. 33. The learned circuit judge seems to have attached much weight to the fact that this provision constitutes a proviso, for he says:

"The office of a proviso is usually that of a limitation." "It here introduces a limitation in two ways: First, by making the franchise operative only on consent of the city; and, second, by allowing the city, in giving its consent, to surround the exercise of the franchise with such further limitations as it may choose to impose."

While the ordinary purpose of a proviso is one of limitation, yet it is not always the case. It sometimes operates to broaden an act, and often is introduced by way of abundant and excessive caution. Provisos should be strictly construed, and their effect ascertained from a general view of the act to which they are attached. Suth. St. Const. § 222.

In the more elaborate street-railway act passed in 1867, and which must be looked to as one source of the city's power to pass the extension ordinance, this provision does not occur as a proviso. There the language of section 13 (being section 3548, How. St.) is that "any street-railway corporation organized under the provisions of this act may, with the consent of the corporate authorities of any city or village," etc., "construct, use, maintain and own a street railway," etc. This would seem to indicate that very little consequence is to be attached to the fact that the consent feature of the train-railway act appears in the form of a proviso. What the intent of the legislature was in requiring the companies organized under that act to obtain the "consent" of the city must be determined by much wider consideration of the questions involved.

To the practical operation of a street railway, three things were essential under the law of Michigan. These were:

First. Corporate capacity; this, because under the law of that state there seems to have been no provision by which natural persons could directly acquire the other requisite franchises.

Second. A franchise to operate the road and take tolls.

Third. A right to occupy particular streets with the necessary tracks and equipments.

These three requisites are distinct and separable. The first two are essentially franchises which could only come from the state; the third and equally essential requisite could not come from the state, and, if acquired at all, must come from the municipality within which it was proposed to exercise its substantial franchises. This conclusion is rested on the limitation imposed upon the legislative power of the state concerning purely municipal interests.

The constitutional provisions referred to are these:

"The legislature shall provide for the incorporation and organization of cities and villages, and shall restrict their powers of taxation, borrowing money, contracting debts and lending their credit." Article 15, § 13.

"The legislature may confer upon organized townships, incorporated cities and villages, and upon the board of supervisors of the several counties, such power of local legislative and administrative character as they may deem proper." Article 4, § 38.

"The legislature shall not * * * vacate nor alter any road laid out by commissioners, or highways, or any street in any city or village, or in any incorporated town plat." Article 4, § 23.

In speaking of the effect of the restrictions upon state interference in local matters of municipalities, the supreme court of Mich-

igan, in Allor v. Wayne Co., 43 Mich. 76–97, 4 N. W. 492, through Campbell, J., said:

"It is not, and it certainly cannot be, claimed that under our constitution there be any such thing as a municipal government which is not managed by popular representatives and agencies deriving their authority from the inhabitants. No business which is in its nature municipal can be controlled by the state or other outside authorities."

He cites People v. Hurlbut, 24 Mich. 44; Hubbard v. Springwells, 25 Mich. 153; People v. Common Council of Detroit, 29 Mich. 108; Attorney General v. Holihan, Id. 116. Judge Campbell, in the same opinion from which we have just quoted, adds:

"The municipal corporations of this state, as we have had frequent occasion to declare, are all organized in such a way as to preserve to the inhabitants full means of self-government." 43 Mich. 102, 4 N. W. 492.

It is impossible to draw from these provisions any recognition of inherent or ungranted authority in either the townships, villages, or cities of Michigan. That they do have the effect to limit materially the ordinary powers of legislatures over the purely local affairs of such communities is most obvious. It is equally obvious that in regard to purely local affairs the legislature can only act by conferring discretionary power in regard to such subjects upon the local authorities. If the legislature wishes to confer or withhold such power, it may do so. If it shall deem such powers expedient, it may confer them with such limitations as it shall deem wise. The power, when conferred, must be subject, as to its exercise, to both local discretion and administration. It can no more command the exercise of the power conferred than it could directly act in regard to such local concerns. From these constitutional limitations a policy favorable to local self-government is plainly deducible; and, in the interpretation of legislative provisions designed to confer power over purely local concerns, consideration should be given to this state policy, as well as to the fact that the legislature ought, in the interest of local government, to confer a wide discretion upon municipalities, being itself incompetent to legislate directly upon such concerns. It is evident that the legislature could not grant to any street railway the right to construct and operate its road upon any particular street. It may provide for the incorporation of such companies, and endow them with the franchises necessary. For the necessary street rights they must be referred to the only authority which can grant such privileges,—the local government of the municipality in which it is proposed to operate such road. It may confer power upon such municipalities to grant or withhold such easements. The right to make such grants may be conferred, subject only to such terms and conditions as the municipality may impose, or it may surround the power with such limitations as it shall deem wise. It cannot require that the municipality shall exercise the powers conferred. That must be left to the discretion of the municipal authority. If this view of the limitations upon the legislative power of the state be sound, it must follow that when the state acts in the only way that it can act,—by conferring upon the municipality the powers necessary to the establishment of such

public facilities of intra-city travel,—and does this in general terms, limitations upon the discretion of the municipality in the exercise of that power ought to be plainly apparent before the court will be justified in declaring their existence.

The design of the legislature was to provide for what was becoming, under the demands of modern civilization, a pressing public necessity,—a necessity as indispensable as lighted or paved streets; yet they were public facilities, the demand for which was only felt in the cities of the state, and was a matter of strictly local interest. The state could only authorize the incorporation of companies, and endow them with such substantial franchises as would enable them to operate such roads whenever the municipalities should grant the necessary consent to the occupation of their streets with their tracks and equipments. This it could only do by a general law applicable to all companies organized to carry on that business. The just, reasonable, and fair interpretation of the provision in each act requiring consent is that nothing in either act shall be construed as authorizing any such road to occupy the streets of any city with its tracks and cars without first obtaining from such city the right of way necessary, which right may be granted by the city upon terms and conditions satisfactory to it and acceptable to the company, and that this consent to such construction and occupancy shall not be subject to repeal or alteration when granted and accepted.

If these two acts be treated as not in themselves conferring any power to consent to the use of the public streets for street-railway purposes, it is because the legislature deemed that such power already existed. If this recognition of the existence of the requisite authority be confined, as to Detroit, to the legislative authority of that city, under its charter powers, to grant a revocable easement, franchise, or license, then it would seem to follow that a necessary effect of the provision found in each of these acts prohibiting the repeal or alteration of the consent granted after acceptance, would operate to destroy the former power of revocation, and make any subsequent exercise of the original legislative power irrevocable. However this may be, we are of opinion that these acts do directly confer power to consent to such use of the streets, and that, when such consent is once given and accepted, it is irrevocable for the term fixed by the grant. The power to consent is in and of itself the power to grant an easement. The "consent" is an easement, and the act of consenting to the use of the streets for street-railway purposes is the act of granting an easement in the streets. Consent to such use of the streets constitutes a typical easement, and the right granted thereby is an interest in realty, being an incorporeal hereditament. Whether this easement is subject to revocation, or is in perpetuity, or for a term of years, may depend upon the terms of the ordinance or the further terms of the act conferring the power to grant the consent.

What the legislature meant by the "consent" it intended the municipality should grant if it saw fit is illustrated by section 10 of the train-railway law. That section permitted such companies to enter upon and condemn, under the state's right of eminent domain,

a right of way 100 feet in width, but limited this right by prohibiting the location of such road "through any orchard or garden without the consent of the owner thereof." This did not, in any true sense, make the operation or exercise of the franchise granted dependent upon the owner of the orchard or garden. It simply said to such companies:

"We grant you the power to enter upon and condemn a right of way; but if, in the exercise of your franchises, you wish to locate your road through an orchard or garden, this power shall not be taken to authorize you to locate your road through such orchard or garden without you obtain the owner's consent,—that is, unless you, by agreement, obtain an easement from the owner."

It is not enough that the incorporators have obtained a franchise to be an incorporation, nor that the corporation has been endowed with power to operate a railroad, commercial or street; but it must also acquire, from those owning or controlling the property on or over which it is proposed to run their road, a permission to occupy sufficient land for that purpose. In this sense it may be said that every railway company having the requisite franchise to acquire, own, and operate such road, and not having the power of eminent domain, is unable to exercise its franchise to operate such a road until it shall first obtain the "consent" of those owning or controlling the land over which its road must be constructed. But it is not true that either the franchise to construct or operate a railway comes from the owner of private lands or the municipal authorities controlling the public streets. The right to construct and operate a road through an orchard or garden or on the public streets is dependent, in the first instance, upon the consent of the owner of the orchard or garden, and, in the second, upon the consent of the local government controlling the public streets. This consent or permission, whether it come from the private owner or the local government, is in all respects, whether it be permanent or for a term of years, or at the will of the one consenting, what the law denominates an "easement," the duration of which is dependent only upon the extent of the interest the grantor had authority to grant, and the terms of the consent itself. That the power, whatever it may be, is not an implied power, is most obvious. The legislature, it must be remembered, did not have the power, independently of the city, to grant to any company a right to enter upon and occupy the streets of Detroit. Now, if it had granted the right to enter upon a particular street and occupy it for such purposes without in terms mentioning the consent of the city, it will be agreed that there was an implied power granted the city authorizing it to consent; but when, as in these two acts, it is expressly provided that the consent of the city must be first obtained, and then the legislature proceeds to expressly state how that consent shall be given,—that the terms and conditions must be such as are satisfactory to the city, and that, after such consent has been given and accepted, the right, franchise or easement shall not be destroyed or unreasonably impaired by any regulation or conditions to be made thereafter by the city,—it seems too obvious for argument that a power is expressly given.

An express statement of the mode in which an implied power is to be exercised, and an express statement of what shall be its effect when exercised, is an inexplicable anomaly.

That the legislature regarded the "consent" of the city to such use of the streets as in itself an easement of way is most apparent when we look to other sections of the same acts. By an amendment of the street-railway sections of the train-railway act it was provided that all such corporations should have the power to borrow money for the purpose of building and operating their roads, "and for that purpose to mortgage," etc., "their road and superstructure, fixtures, rolling stock and equipments, and whenever such road shall have acquired a simple easement or right of way for its proposed road, * * * any mortgage or mortgages executed by such corporation, * * * upon the route or routes where such easement or right of way has been obtained, as aforesaid, shall be a legal and valid lien upon the right of way so obtained to the entire extent of the interest of such corporation * * * therein, * * * and every such mortgage shall be deemed a mortgage upon real estate." Substantially similar power is conferred under the subsequent street-railway act.

The case of People v. O'Brien, to which we have several times referred, is again in point, as to the effect of a municipal power to consent to the construction of such road. In that case the court (as we have in another part of this opinion shown) held:

First. That the "consents" were the muniments of title to the enjoyment of the rights acquired thereunder.

Second. That the limitation stated in the charter was not operative as a limitation upon the power of the city to grant an easement in perpetuity.

The third point, as to the effect of a repeal of the charter upon the rights thus acquired, is not in point here.

It must follow that, if a grant in perpetuity to a 1,000-year corporation was good, a grant for 30 years to a 14-year corporation would be equally good, under a like power to consent.

The same court, in the case of Miner v. Railroad Co., 123 N. Y. 242, 25 N. E. 339, applied the same principle in a condemnation case. A railway corporation was organized with a life of 50 years. It condemned a right of way across the lands in question. Subsequently, it became consolidated with other railroad companies, who took and acquired all its rights, property, and franchises. An action of ejectment was brought to recover the right of way which had been condemned, the life of the corporation which condemned it having expired. It was held that the condemnation of the easement was, in the very nature of the transaction, intended to be a permanent appropriation of the right of way for railroad purposes, and that the easement thus appropriated was not limited to the life of the corporation.

Our conclusion upon this branch of the case is:

First. That the legislature meant, by the term "consent," no more and no less than would be meant by "right of way" or "ease-

ment." "Consent," in the connection used, is synonymous with "easement" or "right of way."

Second. This power to "consent" is not an implied power. The power is directly imported by the language of the act. To say that 'the municipalities shall have power to consent to such use of the public streets is to say no more than is imported when the legislature says that such company may put down their tracks 'with the consent of the city, on terms and conditions agreed upon between the city and the company. In the latter case, quite as plainly as by the first form of expression, the legislature permits the exercise of the power to grant an easement for such purposes. No rule of construction would authorize us to say that in the one form the power is any more express than in the other.

6. We are thus led to conclude that these street-railway acts directly confer upon the municipalities of the state power to grant to street-railway companies such an easement of way in the streets as is requisite for the purposes to be accomplished. That power is conferred without any express words of limitation. On the contrary, the "terms and conditions" upon which the grant is to be made are left to the discretion of the local government. Unless there be some limitation implied by other considerations not yet alluded to, the term for which such a grant may be made is just as much a matter about which municipal discretion is to be exercised as any other of the terms of the grant.

One who contends that a provision of an act must not be read literally must be able to show one of two things, either that there is some other provision which cuts down or expands its meaning, or else that the provision itself is repugnant to the general purview. Nuth v. Tamplin, 8 Q. B. Div. 253; Suth. St. Const. § 238.

It has been urged that by necessary implication this power is limited to an easement not exceeding the duration of the substantial charter franchises, and that such limitation is implied:

First. From a consideration of the policy of the state concerning the duration of corporations as shown by the state constitution.

Second. From the limitation imposed by the legislature upon the life of street-railway companies.

Third. An apprehension of possible evils to result from perpetual or long grants of street privileges.

Section 10, art. 15, of the state constitution provides that no corporation, except for municipal purposes or for the construction of railroads, plank roads, and canals, shall be created for a longer period than 30 years. It has been much debated as to whether street railways come within this prohibition. Street railways were practically unknown when the constitution was adopted. The provision referred to seems to except out of the limitation all that class of quasi public corporations to which a street railway belongs. The same reasons which would demand a long continuance of the powers of a commercial road, a canal, or a plank road, apply to a street railway. These considerations seem to indicate that a railway is not within the class of corporations to

which the constitutional inhibition is applicable, and, if applicable at all, it is only so because the excepted corporations are specifically named. The spirit of the provision would include such companies within the exceptions. The legislature, by the limitation imposed upon the life of street-railway corporations, was probably of opinion that the letter of the constitution operated to require them to apply the limitation, inasmuch as a street railway is not a commercial railway. In any view of the question, that constitutional provision does not afford evidence of any such strong public policy as should operate to impose a limitation upon the power of the city to make a grant of a right of way extending for 16 years beyond the corporate life of the grantee.

The evils to be apprehended from long grants of easements to such companies seem to us not to be such as to justify a constructive limitation on that account. The power to make an irrevocable contract giving an easement of some considerable duration is an inseparable incident in any scheme for furnishing such public facilities as a street railroad. The duration of such grants must be a question of discretion to be exercised by some public authority. That the exercise of that discretion should be left to the local government as a question of purely local interest seems most consistent with the proprieties of the case, and most in accord with the decentralizing policy so peculiar to the state of Michigan.

Lord Eldon, in Wilkinson v. Adam, 1 Ves. & B. 466, quotes Lord Hardwicke as saying that "a necessary implication means, not natural necessity, but so strong a probability of an intention that one contrary to that which is imputed to the party using the language cannot be supposed." This definition meets our approval. Applying it to the considerations urged as sufficient to impose a limitation by implication, we are unable to say that they afford "so strong a probability of an intention that one contrary to that which is imputed cannot be supposed." State v. Union Bank, 9 Yerg. 164.

The decree must be reversed, and bill dismissed.